Ricky WILLIAMS; Sharon Williams; Bonnie (Williams) Gilbert; Delavah Williams; Johnie Williams, Ronnie Williams, Emogene Williams Cobin; Ernestine Williams Webb; Caroline Williams Giles; Verna Williams Hammond; Barbara Williams Guinn; Donna Williams Lockhart, the survivors of Marvin Williams, Appellees,

v.

George F. HARTJE, Jr., Appellant. (Two Cases)

Ricky WILLIAMS; Sharon Williams; Bonnie (Williams) Gilbert; Delavah Williams; Johnie Williams, Ronnie Williams, Emogene Williams Cobin; Ernestine Williams Webb; Caroline Williams Giles; Verna Williams Hammond; Barbara Williams Guinn; Donna Williams Lockhart, the survivors of Marvin Williams, Appellees,

v.

FAULKNER COUNTY, ARKANSAS and Joe Martin, Appellants.

Ricky WILLIAMS; Sharon Williams; Bonnie (Williams) Gilbert; Delavah Williams; Johnie Williams, Ronnie Williams, Emogene Williams Cobin; Ernestine Williams Webb; Caroline Williams Giles; Verna Williams Hammond; Barbara Williams Guinn; Donna Williams Lockhart, the survivors of Marvin Williams, Appellees,

v.

James T. CASTLEBERRY and Jocile C. Perry, Co-executors of the Estate of Joe L. Castleberry, deceased, Appellants.

Ricky WILLIAMS; Sharon Williams; Bonnie (Williams) Gilbert; Delavah Williams; Johnie Williams, Ronnie Williams, Emogene Williams Cobin; Ernestine Williams Webb; Caroline Williams Giles; Verna Williams Hammond; Barbara Williams Guinn; Donna Williams Lockhart, the survivors of Marvin Williams, Appellants.

v.

FAULKNER COUNTY, ARKANSAS; James T. Castleberry and Jocile C. Perry, Co-executors of the Estate of Joe L. Castleberry, deceased; Joe Martin; City of Conway, Arkansas; Marvin Iberg; O.H. (Bill) Mullenax; and George F. Hartje, Jr., Appellees.

Nos. 86–1791 to 86–1794 and 86–1949.

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1987.

Decided Aug. 28, 1987.

John Wesley Hall, Jr., Little Rock, Ark., for appellants.

Jeffrey A. Bell, Little Rock, Ark., for George F. Hartje, Jr.

David White, North Little Rock, Ark., for City of Conway, Ark.

Bart Mullis, Pine Bluff, Ark., for O.H. (Bill) Mullenax.

Before LAY, Chief Judge, ARNOLD and WOLLMAN, Circuit Judges.

ARNOLD, Circuit Judge.

This civil-rights case is before us on interlocutory appeal under 28 U.S.C. § 1292(b) from the orders of the District Court [1] dismissing the complaint as to certain defendants and denying motions to dismiss as to others. The complaint arises out of the 1960 jail death of Marvin Williams. The plaintiffs are his surviving family members. The defendants are Faulkner County, Arkansas, the City of Conway, and various employees and officers of those entities. We affirm the orders of the District Court holding the complaint against the City and its employees to be time-barred; affirm the order which denied a motion to dismiss the complaint against the County and its employees; and reverse the order denying immunity to George Hartje, who in 1960 was the prosecutor for the district including Faulkner County.

## I. FACTS

Early on the morning of May 6, 1960, Marvin Williams, a young black man, was arrested in Conway, Arkansas, by Marvin Iberg and Bill Mullenax, officers of the Conway Police Department, on a charge of public drunkenness. He was taken to the

---

1. The Hon. Garnett Thomas Eisele, Chief Judge, United States District Court for the Eastern District of Arkansas.

Faulkner County jail and placed in a cell there under the custody of Joe Martin, the jailer. Joe Castleberry, the sheriff (now deceased) was also present. Sometime during the night, Williams died while in the jail.

On May 7, 1960, a coroner's inquest was held. The elected coroner, R.A. McNutt (now deceased), was assisted by George Hartje, the Prosecuting Attorney. Hartje examined the witnesses at the inquest. Iberg and Mullenax (the arresting officers) testified that Williams had been heavily intoxicated and "stuporous" when they arrested him, and that he fell while entering the jail and struck his forehead on the steps, causing a small cut. Charles Hackney, an inmate in the Faulkner County jail, testified that he saw and heard nothing out of the ordinary except that he heard Williams groaning during the night. The coroner's jury was not shown a report of the autopsy that was performed, but was told that the cause of death was a concussion. The coroner's jury concluded that there was no foul play from the time of Williams's arrest until his death.

The Williams family suspected in 1960 that Marvin Williams's death was not the result of a fall while intoxicated. They made inquiry of two local attorneys and approached the Federal Bureau of Investigation. The attorneys and the FBI told them that there was no ground for a lawsuit or further investigation. In 1984, twenty-four years later, Charles Hackney, the person who had been an inmate at the Faulkner County jail the night of Williams's arrest, came forward and told the press and the Williams family that he had additional evidence that Marvin Williams had been murdered in the jail on May 6, 1960. Hackney stated that he had seen Martin and Castleberry (the jailer and sheriff) enter the Negro area of the jail (which was then unlawfully segregated) and remove Williams to the top of a flight of stairs, where they both beat him. According to Hackney, one of the defendants said "that ought to take care of that ... forever." Hackney recanted his testimony to the 1960 coroner's jury, alleging that

defendant Hartje had threatened him and warned him not to remember seeing anything at the jail.

The Hackney disclosures in 1984 caused the Williams family to renew their investigation of Marvin Williams's death. The 1960 autopsy report was obtained, apparently for the first time. It stated that Marvin Williams had no trace of alcohol in his blood at the time of his death (contradicting testimony given to the 1960 coroner's jury), and showed the cause of death to have been a fractured skull and concussion behind the left ear, which was inconsistent with the earlier explanation of Williams's having fallen and struck his forehead on the jail steps. A further re-examination performed on the exhumed remains by the current Arkansas medical examiner in 1984 (in connection with criminal proceedings)[2] cast further doubt on the correctness of the 1960 coroner's findings. This lawsuit followed.

## II. STATUTE OF LIMITATIONS

Federal civil-rights actions are subject to the statutes of limitations of the state in which suit is brought. In Arkansas, the limitations period for personal-injury and wrongful-death actions is three years after accrual of the action. Ark.Stat.Ann. § 37–206. Since the complaint in this case was filed over twenty-four years after the death of Marvin Williams, it is time-barred unless under the law of Arkansas the statute was tolled.

■ Under Arkansas law, an affirmative action by the defendant which has the effect of fraudulently concealing the plaintiff's cause of action is effective to toll the statute of limitations. See, e.g., *Walters v. Lewis*, 276 Ark. 286, 290–91, 634 S.W.2d 129, 132 (1982). If fraudulent concealment is properly pleaded, the complaint is invulnerable to dismissal on limitations grounds and a fact question is created on which both sides are entitled to offer proof. *Brewer v. Hawkins*, 241 Ark. 460, 464, 408 S.W.2d 492, 494 (1966). The statute of

---

2. Criminal charges were brought against Iberg and Mullenax (the Conway arresting officers) in

1985. Both men were acquitted by a jury in September of that year.

limitations begins to run no later than the day that the concealed matter was discovered. But concealment of facts, no matter how fraudulent or otherwise wrongful, has no effect on the running of a statute of limitations if the plaintiffs could have discovered the fraud or sufficient other facts on which to bring their lawsuit, through a reasonable effort on their part. See *Walters v. Lewis*, 276 Ark. at 291, 634 S.W.2d at 132.

The plaintiffs here allege that at least some of the defendants wrongfully concealed important evidence which, if known in 1960, would have provided the basis for a lawsuit over Marvin Williams's death. The evidence allegedly concealed was the testimony of Charles Hackney, who claims to have been an eyewitness to a beating administered to Marvin Williams by Joe Martin, the jailer, and Joe Castleberry, the Sheriff of Faulkner County, on May 6, 1960. Castleberry, Martin, and George Hartje, the prosecutor, allegedly told Hackney that he would suffer the same end if he did not testify that he knew nothing about Williams's death. Hackney testified accordingly at the inquest. These allegations are well pleaded by the plaintiffs, and therefore the limitations bar cannot be applied through a motion to dismiss under Fed.R.Civ.P. 12(b)(6). If the defendants' motions are viewed as motions for summary judgment, they must still fail, because Hackney's allegations are matters of disputed fact. It cannot be said that the plaintiffs failed to exercise due diligence in not discovering this alleged cover-up, because their only possible source of information was locked up in the mind of Charles Hackney and remained there until he was ready to come forward with his story, which he did in 1984. Therefore, we affirm the order of the District Court denying the motions of the County defendants, Faulkner County, Arkansas, Joe Martin, and the Estate of Joe L. Castleberry, for dismissal or summary judgment on statute-of-limitations grounds.

■ Although the District Court denied the motion for summary judgment by the County and its employees, it granted a similar motion by the City of Conway and its former employees, Officers Mullenax and Iberg. The plaintiffs urge that the statute of limitations should also be tolled as to these defendants because of the fraudulent concealment of evidence. But the concealment of the potential testimony of Charles Hackney was (if Hackney is believed) the work of the County defendants, Castleberry, Martin, and Hartje. Hackney's testimony, which has been consistent since he came forward in 1984, is that the persons who beat Marvin Williams were Sheriff Castleberry and jailer Martin and that the persons who coerced his (Hackney's) silence at the coroner's inquest were Castleberry, Martin, and the prosecutor, George Hartje. None of his testimony, even if all of it were believed, adds anything to a case against the Conway defendants. In fact, it tends to exonerate Officers Mullenax and Iberg of any wrongdoing. Neither is there any evidence that the Conway defendants conspired to silence Hackney. When a statute of limitations is tolled because of an act of fraud, the tolling extends only so far as the fraud itself; while the concealment of testimony may have prevented the bringing of an action against the County defendants to whom the testimony related, it can have had no effect on any possible action against the City defendants, since none of Hackney's testimony points to them.

■ The plaintiffs also contend that the statute of limitations should be tolled because they did not see the autopsy report until 1984. That report indicated that Marvin Williams died of a concussion caused by a fractured skull behind the left ear. It also stated that at the time of death there was no measurable amount of alcohol in his blood. Both of these facts tend to contradict the defendants' theory that Williams suffered a concussion from a fall while drunk, in which he struck his forehead on the steps of the jail. But failure on the part of the plaintiffs to obtain that report prior to 1984 is not the same thing as fraudulent concealment by one or more of the defendants. The plaintiffs' briefs suggest that the existence of the autopsy report was somehow concealed for twenty-four years, but they offer no evidence that this is so. In the 1985 criminal trial, Dr. Edward O. Fox testified that in May 1960,

while he was a resident at the University of Arkansas School of Medicine, he performed an autopsy on the body of Marvin Williams. He also testified that after the report of the autopsy was completed no one asked him about the autopsy until 1984, when he was interviewed by a reporter.

The transcript of the Coroner's Inquest held on May 7, 1960 indicates that the coroner's jury was told that the body had been taken to Little Rock for an autopsy; they were told that the coroner had received a telephone report of the results of the autopsy. The coroner, R.A. McNutt (now deceased), said:

> The State Pathologist who performed the autopsy called last night and gave me this here information. Dr. Faulks [sic] is the man who did the work, and he says that there was a fracture of the skull in the left temple region. Epidermal Hematoma, that's a blood clot. And a laceration in front of his head. Now that's all I have here, but his written report will come next week and it will be more detailed[ ] than this, and then after they have had an opportunity to make a microscopic examination we'll get a detailed report weeks from now that will be pages long.

Tr. of Coroner's Inquest at 64–65. The following discussion ensued:

> A JUROR: You didn't have a verbal statement about the cause of death?
> CORONER: Well, the cause of death is the—
> PROSECUTOR: A [b]lood clot in the left temple region.
> A JUROR: Above the left ear.
> CORONER: Concussion.
> A JUROR: Not the injury on the—
> PROSECUTOR: Not the injury on the forehead.
> A JUROR: In other words the one back here is the one that killed him, not the one right here[ ] (pointing to forehead over right eye).
> CORONER: The injury, that's right, the injury back here is the one that killed him.

*Id.* at 65.

The coroner's jury concluded that Marvin Williams died as the result of a concussion.

"as revealed by autopsy done by the State Pathologist," but that testimony revealed no evidence of foul play between the time of arrest and the death. *Id.* at 112. Delavah Williams, Marvin Williams's father and one of the plaintiffs here, was present at the inquest and presumably heard the oral report of the autopsy and the references to a written report under preparation. Although he later consulted with two local lawyers about his son's death and apparently sought assistance from the FBI, there is no evidence that anyone looked for the written autopsy report until 1984, when it was found in the records of the former coroner's place of business. While it may appear highly implausible that two experienced lawyers and a federal law-enforcement agency would not have started their investigation from the medical evidence, there is simply no evidence that a search was made. Before a court can conclude that evidence has been fraudulently concealed, it must at least be shown that a reasonably diligent search has been made in the places where that evidence was likely to be found. Apparently, no such search was made. Failure to make such a search was not reasonable under all the circumstances. Since the autopsy report would have disclosed evidence that Marvin Williams was not intoxicated at the time of his death and that he was likely to have come to his death from a skull fracture inconsistent with a fall onto his forehead, the autopsy report would have been sufficient evidence, had the plaintiffs looked for it, to bring the same accusations within the limitations period which they have now brought two decades later.

Plaintiffs argue that their failure to obtain the autopsy report and press their claims earlier should be excused because of the climate of racial prejudice prevailing in Arkansas during the early sixties. Marvin Williams's father testified: "[Y]ou know how it was back in 1960? A black man's word didn't mean a thing." D. Williams at 59. Certainly there is a factual basis for this argument, enough of a basis anyway to survive a motion for summary judgment. We nevertheless agree with the District Court that it must fail as a matter of law.

The question presented here is whether these defendants fraudulently concealed evidence. The racial atmosphere of an entire State cannot justly be charged to their personal account. Nor is it true that a black plaintiff's Section 1983 claim would not have been fairly tried in a federal court in the early sixties—though in that day of Section 1983 litigation's infancy, the claim might have had hard going as a legal matter. And finally, the oppressive racial atmosphere has progressively (if too slowly) improved over the years. We do not claim that racial prejudice is gone, in Arkansas or any other State. But by 1981 (three years before this action was filed) it was clearly no longer a substantial barrier to the filing of lawsuits. We agree with the District Court that "statutes of limitations are public policy decisions that should be established by the Legislative Branch of our government. Absent some different pronouncement by that branch, the courts should determine tolling issues in keeping with established precedent." *Ricky Williams v. Faulkner County, Arkansas,* No. LR–C–84–791, slip op. 10 (E.D.Ark., memorandum and order filed May 12, 1986).

We therefore affirm the grant of summary judgment in favor of the City of Conway, Marvin Iberg, and O.H. (Bill) Mullenax.

### III. PROSECUTORIAL IMMUNITY

In its order of July 18, 1986, the District Court denied the motion of defendant George Hartje, the former prosecutor, for summary judgment on the ground of absolute immunity. We disagree with the District Court's analysis of this question and therefore reverse.

Hartje is a defendant here because the complaint alleges that he conspired with others to cover up the potential testimony of Charles Hackney as to the events occurring inside the jail on May 6, 1960. He therefore is aligned with the "County defendants," i.e., those for whom the statute-of-limitations defense does not apply, for reasons we have explained.

Prosecutors are absolutely immune from suits for damages arising out of their official duties in initiating and pursuing criminal prosecutions. *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Not all acts of a prosecutor are immunized, but the immunity does extend to cover all acts undertaken in the role of advocate in the judicial phase of criminal proceedings. See *Martinez v. Winner,* 771 F.2d 424, 437–38 (10th Cir.1985), *vacated as moot after remand by Supreme Court,* 800 F.2d 230 (10th Cir.1986). This includes actions connected with initiation of prosecution, even if those actions are patently improper. *Ibid.* The purpose of absolute immunity is to protect the function of the prosecutor as a key participant in the criminal process. The doctrine involves a choice between protecting all prosecutors from harassing lawsuits over their official acts and providing redress for all injuries occasioned by those acts. When such a choice is made in the law, it is inevitable that someone will be hurt. But the choice must be made, and it has been long decided that it is better to allow a few wrongs to go unredressed than to expose all prosecutors to the risk of retaliation for their occasional honest mistakes. *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949) (L. Hand, J.), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

The District Court denied immunity to Hartje because Hartje's actions in assisting at the coroner's inquest were not part of the statutorily authorized duties of a prosecutor. See Ark.Stat.Ann. §§ 24–102, –136, –138. Hartje offered affidavits from every person who had served in the position of prosecutor in the Fifth Judicial District of Arkansas between 1949 and 1970 which showed that, at least in that district, prosecutors routinely advised coroners in the conduct of inquests and presided at those proceedings. The District Court concluded that such actions were taken by the prosecutors as volunteers, and since they were not expressly authorized by statute, they could not be deemed part of the protected prosecutorial function. We think this reasoning is too narrow. The immunity which attaches to a prosecutor's actions is based on his role in fact as an advocate in the criminal process. Although most functions within that role are defined by statute,

there is no reason to exclude from protection other acts, fully consistent with the prosecutor's function, which may, as a matter of local custom or necessity, have become imbedded in his job, provided always, of course, that no law prohibits the prosecutor from performing the type of duty in question.

The coroner's duties are defined in Ark. Stat.Ann. §§ 42–301 *et seq.* This portion of the Arkansas Statutes has been virtually unchanged since 1839. The coroner's role in the criminal process is to call a jury for the purpose of inquiring into the cause, circumstances, and manner of death when a body has been found and there are circumstances which cause suspicion of foul play. The coroner has the power to summon and examine under oath suspects and other witnesses, have a transcript prepared, and submit the evidence to the jury for their decision. If the jury determines that the death is a homicide, the coroner has the power to arrest or cause to be arrested a person against whom there is probable cause in connection with the homicide. The coroner is an elected official of the county. There is no requirement that the coroner be an attorney, and usually he is not. Since the coroner's inquest is in effect a quasi-judicial proceeding, in many ways analogous to a grand jury, it is understandable that a non-lawyer coroner would desire the assistance of an attorney in conducting the inquest. The prosecuting attorney is the obvious choice. Although there are significant differences between the grand-jury investigation and the coroner's jury inquest, they share an important purpose: to hear evidence as to a possible crime and to decide whether criminal proceedings should be set in motion.

 The decision of a prosecutor to file criminal charges is within the set of core functions which is protected by absolute immunity. *Myers v. Morris,* 810 F.2d 1437, 1446 (8th Cir.), *petition for cert. filed,* —— U.S. ——, 108 S.Ct. 97, 97 L.Ed. 2d —— (1987). This is so even if the prosecutor makes that decision in a consciously malicious manner, or vindictively, or without adequate investigation, or in excess of his jurisdiction. *Ibid.* Here the Dis-

trict Court correctly stated that "if defendant Hartje had done all he is alleged to have done in connection with a grand jury investigation he would be entitled to absolute immunity." Letter to Counsel, May 29, 1986, at 2; D.R. at 255. But the Court distinguished between a grand-jury investigation and an inquest on the ground that no positive law expressly authorizes the prosecutor to assist the coroner or to conduct the inquest. The distinction is strained. If the coroner were the defendant in this case, it would seem clear that his actions would be immune from suit for damages; he would have the benefit of the same immunity which a prosecutor enjoys in the grand-jury setting, because the coroner's inquest is a quasi-judicial proceeding for the purpose of inquiring into the circumstances of a suspicious death and, if appropriate, laying criminal charges. In the instant case, the prosecutor followed long-established local law-enforcement custom in sharing the coroner's responsibility in order to provide the legal expertise lacked by an elected non-lawyer coroner. His role, although not required by statute, is not inconsistent with any of his statutory duties. We hold that the coroner's inquest held on May 7, 1960, was a quasi-judicial proceeding analogous to a grand-jury inquisition; in that proceeding Prosecutor Hartje acted as an advocate representing the state for the purpose of deciding whether to initiate criminal proceedings over the death of Marvin Williams; his conduct at that proceeding was within the scope of his prosecutorial function and is absolutely immune from a suit for damages.

The most serious charge leveled against Hartje, however, is that he coerced Charles Hackney into giving false testimony by threatening him in the jailhouse the day before the inquest was held. Plaintiffs suggest that this act was not within the protected prosecutorial function since at the time Hartje was doing preliminary investigation, in other words, police work.

*Imbler* recognized that the role of the prosecutor as advocate includes certain duties and tasks which are preliminary to initiation of prosecution and are not strictly

courtroom work. Preparation for initiation of the criminal process involves investigative work mixed with prosecutorial decision-making. The Court said "[a]t some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them." *Imbler v. Pachtman*, 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33. In drawing the line between absolutely immune activity and other activity, we think the important consideration is not whether the act was one which could be done only by a prosecutor as attorney, but rather whether the act was closely related to the prosecutor's role as advocate. It would make little sense to immunize the prosecutor's decision to prosecute while not immunizing the immediately preceding steps which lead to that decision. The act of calling witnesses has been held to be intimately associated with the judicial process, and therefore immune even when the prosecutor knows that the testimony of those witnesses will be false. *Hamilton v. Daley*, 777 F.2d 1207, 1212–13 (7th Cir.1985). We agree with the Court of Appeals for the Third Circuit that while some of a prosecuting attorney's preliminary investigative work may be analogous to a police detective's investigation, and should therefore be only qualifiedly immune, investigation to secure the information necessary to the prosecutor's decision to initiate criminal proceedings is within the quasi-judicial aspect of the prosecutor's job and therefore is absolutely immune from civil suit for damages. See *Forsyth v. Kleindienst*, 599 F.2d 1203, 1215 (3d Cir.1979), *cert. denied*, 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981).

Prosecutor Hartje's investigation in the jail on May 6, 1960 included interviews with all inmates in order to determine whether any of them had knowledge of the death of Marvin Williams. It was at that time that the allegedly coercive interview with Hackney took place. As a result of these interviews and of the autopsy, a coroner's jury was convened for the official purpose of determining whether any further criminal proceedings were called for. The jail interviews on May 6 were for the purpose of developing necessary information for the coroner's inquest. Subsequently, all inmates were called to testify at the inquest. We hold that the work performed by Hartje at the jail on May 6 was essential to the ensuing decision whether to prosecute. We therefore reverse on the issue of prosecutorial immunity, and direct that the complaint be dismissed as to George Hartje, Jr.

Affirmed in part, reversed in part, and remanded.