843 F.2d 1103
 Roy C. LEWELLEN, Jr., Appellee,
v.
Gene RAFF, individually and in his official capacity as
Prosecuting Attorney for the First Judicial District of
Arkansas; David Cahoon, individually and in his official
capacity as Deputy Prosecuting Attorney for Lee County,
Arkansas; Henry Wilkinson, individually and in his official
capacity as Circuit Court Judge for the First Judicial
District of Arkansas, Appellants.
Lafayette Patterson; Jeanne Kennedy; Doug Williams; Lee
County, Arkansas; Robert May, Jr., individually
and in his official capacity as Sheriff
of Lee County.
Lafayette PATTERSON
v.
Robert BANKS; Margie Banks; Reverend Almore Banks (Four Cases).
Roy C. LEWELLEN, Jr., Appellee,
v.
Gene RAFF, individually and in his official capacity as
Prosecuting Attorney for the First Judicial District of
Arkansas; David Cahoon, individually and in his
official capacity as Deputy Prosecuting Attorney for Lee
County, Arkansas; Lafayette Patterson; Jeanne Kennedy;
Doug Williams, Appellant.
Lee County, Arkansas; Robert May, Jr., individually and in
his official capacity as Sheriff of Lee County; Henry
Wilkinson, individually and in his official capacity as
Circuit Court Judge for the First Judicial District of Arkansas.
Roy C. LEWELLEN, Jr., Appellee,
v.
Gene RAFF, individually and in his official capacity as
Prosecuting Attorney for the Eastern Judicial District of
Arkansas; David Cahoon, individually and in his official
capacity as Deputy Prosecuting Attorney for Lee County,
Arkansas; Lafayette Patterson; Jeanne Kennedy; Doug
Williams, Lee County, Arkansas;
Robert May, Jr., individually and in his official capacity
as Sheriff of Lee County, Appellant.
Henry Wilkinson, individually and in his official capacity
as Circuit Court Judge for the First Judicial
District of Arkansas.
Roy C. LEWELLEN, Jr., Appellant,
v.
Gene RAFF, individually and in his official capacity as
Prosecuting Attorney for the First Judicial District of
Arkansas; David Cahoon, individually and in his official
capacity as Deputy Prosecuting Attorney for Lee County,
Arkansas, Appellees.
Lafayette Patterson; Jeanne Kennedy; Doug Williams; Lee
County, Arkansas; Robert May, Jr., individually and in his
official capacity as Sheriff of Lee County; Henry
Wilkinson, individually and in his official capacity as
Circuit Court Judge for the First Judicial District of Arkansas.
 Nos. 87-1069, 87-1100, 87-1101 and 87-1103.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 14, 1987.
Decided April 4, 1988.
 
 David S. Mitchell, Little Rock, Ark., for Gene Raff, David Cahoon and Henry Wilkinson.
 Timm Humphries, Little Rock, Ark., for Sgt. Doug Williams.
 Gregory T. Jones, Little Rock, Ark., for Gene Raff and David Cahoon.
 John W. Walker, and George Hairston, Little Rock, Ark., for Roy C. Lewellen.
 Before LAY, Chief Judge, and ARNOLD and BOWMAN, Circuit Judges.
 LAY, Chief Judge.
 
 
 1
 At issue is the serious question whether the federal district court[1] erred in not exercising Younger[2] abstention by enjoining a criminal prosecution brought by the State of Arkansas against a black attorney in Lee County, Arkansas. We affirm the grant of the temporary injunction. We reverse in part the district court's rulings on the section 1983 damages claims.
 
 I. Background
 
 2
 On June 7, 1984, Reverend Almore Banks, a black minister, was charged with rape in the Circuit Court of Lee County, Arkansas. The alleged victim was Latonia Wilbun, the eleven-year-old daughter of Mrs. Lafayetta Patterson.[3] Mrs. Patterson's husband, Joe Lewis Patterson, is the brother of Rev. Banks's wife, Margie Banks. The Pattersons are also black.
 
 
 3
 Rev. Banks engaged Roy Lewellen, a black attorney, to represent him. Mrs. Patterson employed Olly Neal, also a black attorney, to represent her interest and the interest of her daughter in the criminal prosecution. Lee County Prosecutor Gene Raff and Deputy Prosecutor David Cahoon, both white, represented the state in the proceeding.
 
 
 4
 Jury selection in Banks's trial began on Tuesday, September 3, 1985, with Judge Harvey Yates presiding. On Thursday, September 5, Neal contacted Deputy Prosecutor Cahoon to inform him that Mrs. Patterson was being pressured to "drop the charges" against Banks. Mrs. Patterson claimed that the pressure was coming from her husband, from Rev. and Margie Banks, and from Rev. Banks's brother, Robert.
 
 
 5
 Mrs. Patterson and others testified about the events that took place that Wednesday that prompted Neal to contact the prosecutor. Robert Banks came to the Patterson house on Wednesday morning and discussed the pending charges against Rev. Banks with the Pattersons. The three of them reached an apparent agreement that if Mrs. Patterson would drop the charges, Rev. Banks would leave town. Mrs. Patterson, however, claims that she did not then or ever actually intend to drop the charges.
 
 
 6
 Mr. and Mrs. Patterson and Robert Banks then proceeded to Neal's office, apparently to have him prepare a paper documenting their agreement. Margie Banks somehow was informed of or arranged the meeting at Neal's office. She called Lewellen and informed him that he too should go to Neal's office, because Mrs. Patterson was going to drop the charges against Lewellen's client.
 
 
 7
 When they arrived at Neal's office, Mrs. Patterson met privately with Neal. She told him that she in fact had no intention of dropping the charges. Neal relayed this information to those assembled in his office. Mr. Patterson became angry, feeling that his wife had been steadily lying to him about dropping the charges. Lewellen left Neal's office immediately, saying only, according to Mrs. Patterson, that he had thought the family was going to resolve it.
 
 
 8
 Later that day, after returning home, Mr. Patterson phoned Margie Banks and told her that Mrs. Patterson was indeed going to drop the charges. Mrs. Patterson claims she led her husband to believe this because she was afraid of him and wanted everyone to leave her alone. After a series of phone calls, it was arranged that Lewellen would bring Rev. and Margie Banks to the Patterson home. Robert Banks was also present at this meeting. Lewellen did not stay at the meeting.
 
 
 9
 The parties again reached an apparent agreement that Mrs. Patterson would drop the charges, Rev. Banks would leave town, and Mrs. Patterson would be reimbursed by the Bankses for the $500 attorney's fee she had incurred by retaining Neal to represent her interests. Lewellen later returned to pick up his client. He did not wish to hear what had happened at the meeting, stating something to the effect of, "look here, if you all are going to settle this, settle it with your family. I don't want to have anything to do with it. I don't want to know what's going on."
 
 
 10
 These were the events that, when relayed to Neal, prompted him to call Deputy Prosecutor Cahoon. Cahoon then told Prosecutor Raff and Lee County Sheriff Robert May that he had received information suggesting that bribes were being offered to Mrs. Patterson by Rev. Banks to induce her to drop the charges. At the direction of the prosecutors, May requested investigatory assistance from the Arkansas state police. May informed the state police that electronic surveillance equipment might be needed to conduct the investigation.
 
 
 11
 Later that day, Sgt. Douglas Williams of the state police arrived in town to begin assisting in the investigation, bringing with him his electronic surveillance equipment. Williams, May, and Cahoon met with Mrs. Patterson and Neal at the Marianna jail to discuss Mrs. Patterson's complaint. Jeanne Kennedy, a victim's advocate and child abuse and rape counselor, was also present. Mrs. Patterson was equipped with a hidden body microphone and directed to engage in conversation with Mr. Patterson and others to corroborate her allegations. Although Rev. Banks was an investigatory target at this point, Lewellen was not.
 
 
 12
 Mrs. Patterson left the jail, found her husband at a local ball field, and told him that she would agree to drop the charges if Rev. Banks left town and the parties adhered to their agreement of the day before. She also told him that she wanted a lawyer to draft a document setting forth Rev. Banks's agreement to leave town. Mrs. Patterson then made a series of phone calls. The Pattersons' part of these conversations was recorded by Sgt. Williams, who operated a receiving and recording device in a car parked near the Patterson home. The tape, referred to as "E-1," contains at least two and allegedly more gaps in transmission.
 
 
 13
 That night the Pattersons and the three Bankses met with Lewellen at Lewellen's office. Mrs. Patterson was still equipped with a body microphone, and the conversation was recorded.[4] Later that night, the tape was played for Prosecutor Raff at Sheriff May's home and transcribed at the offices of a private law firm with which Cahoon was associated. The prosecutors suggested the need, under the Arkansas witness bribery statute,[5] for further investigation to clarify what Mrs. Patterson was being induced to do.
 
 
 14
 The next day, Sgt. Williams took a statement from Mrs. Patterson. Because of Raff's suggestion the night before, Mrs. Patterson attempted to reach Lewellen by telephone. When they eventually spoke, their phone conversation was recorded. This tape recording, identified as "E-4," contained the following statement by Lewellen:
 
 
 15
 See, it's up to you in the sense that if you and your child don't come up there, then they're going to drop it. They can't make you come to no courtroom and testify to nothing. I don't give a shit if they subpoena you. You don't have to--You can go up there and say, "I ain't got nothing to say." You understand? Huh?
 
 
 16
 Rev. Banks's rape trial resumed on Monday, September 9. Before any jurors were called, prosecutors Raff and Cahoon informed Judge Yates that there was a matter that they were required to bring to his attention. They proceeded to place on the record, in closed proceedings, their outline of the witness bribery investigation. Mrs. Patterson and Sgt. Williams testified about the alleged bribery and the investigation. Lewellen was not allowed to cross-examine these witnesses, nor did Judge Yates allow Lewellen to present witnesses in his own or Rev. Banks's behalf. Lewellen was permitted only to make a statement addressing the effect of what had transpired on Rev. Banks's rape trial.
 
 
 17
 After a brief recess, Judge Yates sua sponte declared a mistrial. He also stated that he intended to send a transcript of that day's proceedings to the Arkansas Supreme Court Committee on Professional Conduct.
 
 
 18
 On September 27, Sheriff May executed an affidavit in support of an information charging Lewellen and Rev. Banks with witness bribery and conspiracy to commit witness bribery. That same day, the prosecutors presented the information to Municipal Judge Dan Felton, III. Lewellen's case was placed on the Lee County Circuit Court criminal docket and set for trial for February 7, 1986. Upon Lewellen's motion, his trial was continued to May 19, 1986.
 
 
 19
 On April 28, 1986, Lewellen brought suit in federal court against Prosecutors Raff and Cahoon, Sheriff May, Sgt. Williams, Lee County, Lafayetta Patterson, and Jeanne Kennedy. Lewellen later added as a defendant Judge Henry Wilkinson, who was due to preside over Lewellen's criminal trial in Lee County Circuit Court. Lewellen sought damages and injunctive and declaratory relief[6] under 42 U.S.C. Secs. 1981, 1983, 1985, 1986, and 1988 for alleged violations of his rights under the first, fourth, fifth, thirteenth, and fourteenth amendments. He also asserted pendent state law claims. The gist of Lewellen's complaint was that the defendants conspired to and did investigate and prosecute him because of his race and to retaliate against him for exercising his constitutional rights.
 
 
 20
 After a number of continuances, Lewellen's state criminal trial was finally scheduled for November 17, 1986. On October 27, 1986, Lewellen moved the federal court for a temporary restraining order to enjoin the prosecutors and Judge Wilkinson from going forward with the state criminal trial. The district court granted this motion on November 14 and set a hearing on Lewellen's motion for a preliminary injunction.
 
 
 21
 Following a six-and-one-half-day hearing, the district court issued a preliminary injunction barring the state officials from proceeding with Lewellen's criminal trial pending adjudication of Lewellen's federal court action on the merits. Lewellen v. Raff, 649 F.Supp. 1229 (E.D.Ark.1986). One week later, on December 15, 1986, the district court ruled on a number of other motions; these orders, from which various parties appeal, are discussed in succeeding sections.
 
 II. Discussion
 A. Preliminary Injunctive Relief
 
 22
 Prosecutors Raff and Cahoon and Judge Wilkinson appeal from the district court's entry of a preliminary injunction barring them from proceeding with the state criminal case against Lewellen. For reversal, they argue that the district court should have abstained from exercising jurisdiction, pursuant to the principles of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). They also argue that the district court applied an erroneous legal standard to determine whether the preliminary injunction should issue. We turn first to the question of Younger abstention.
 
 
 23
 In Younger, the Supreme Court held that federal courts as a rule should abstain from exercising jurisdiction when asked to enjoin pending state criminal proceedings. Id. at 56, 91 S.Ct. at 757.[7] The Younger abstention doctrine is a reflection of the public policy that disfavors federal court interference with state judicial proceedings. The doctrine is based on comity and federalism. See Ronwin v. Dunham, 818 F.2d 675, 677 (8th Cir.1987) (citing Younger, 401 U.S. at 44, 91 S.Ct. at 750).
 
 
 24
 Despite the concerns underlying the Younger abstention principle, however, in certain cases the duty of the federal courts to vindicate and protect federal rights must prevail over the policy against federal court interference with state criminal proceedings. The federal courts have consistently and repeatedly affirmed that their abhorrence of enjoining a pending state prosecution must yield when the state prosecution threatens a party with "great and immediate irreparable injury." See, e.g., Younger, 401 U.S. at 56, 91 S.Ct. at 757; Dombrowski v. Pfister, 380 U.S. 479, 485-87, 85 S.Ct. 1116, 1120-21, 14 L.Ed.2d 22 (1965); Collins v. County of Kendall, 807 F.2d 95, 98 (7th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987); Rowe v. Griffin, 676 F.2d 524, 525 (11th Cir.1982); Fitzgerald v. Peek, 636 F.2d 943, 944 (5th Cir.), cert. denied, 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981); Munson v. Janklow, 563 F.2d 933, 935 (8th Cir.1977); Timmerman v. Brown, 528 F.2d 811, 815 (4th Cir.1975).
 
 
 25
 The requisite threatened injury must be more than simply "the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution * * *." Younger, 401 U.S. at 46, 91 S.Ct. at 751. The injury threatened is both great and immediate, however, when "defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights," Dombrowski, 380 U.S. at 485, 85 S.Ct. at 1120, or when the prosecution is initiated in bad faith or to harass the defendant. See, e.g., Cameron v. Johnson, 390 U.S. 611, 617-18, 88 S.Ct. 1335, 1338, 20 L.Ed.2d 182 (1968); Central Ave. News, Inc. v. City of Minot, 651 F.2d 565, 568-70 (8th Cir.1981). In this context, bad faith "generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction." Kugler v. Helfant, 421 U.S. 117, 126 n. 6, 95 S.Ct. 1524, 1531 n. 6, 44 L.Ed.2d 15 (1975); see also Central Ave. News, 651 F.2d at 570. Bad faith and harassing prosecutions also encompass those prosecutions that are initiated to retaliate for or discourage the exercise of constitutional rights. See, e.g., Younger, 401 U.S. at 48, 91 S.Ct. at 752 (Dombrowski defendants were threatened with great and immediate irreparable injury because prosecutions were initiated "to discourage them and their supporters from asserting and attempting to vindicate the constitutional rights of Negro citizens of Louisiana.") (quoting Dombrowski, 380 U.S. at 482, 85 S.Ct. at 1119); Heimbach v. Village of Lyons, 597 F.2d 344, 347 (2d Cir.1979) (per curiam) (allegation that state criminal prosecution was initiated to chill first amendment rights sufficient to remove Younger bar against federal court interference).
 
 
 26
 A showing that a prosecution was brought in retaliation for or to discourage the exercise of constitutional rights "will justify an injunction regardless of whether valid convictions conceivably could be obtained." Fitzgerald v. Peek, 636 F.2d 943, 945 (5th Cir.1981) (emphasis added). The state does not have any legitimate interest in pursuing such a prosecution; "[p]erhaps the most important comity rationale of Younger deference--that of respect for the State's legitimate pursuit of its substantive interests--is therefore inapplicable." Wilson v. Thompson, 593 F.2d 1375, 1383 (5th Cir.1979) (citations omitted).
 
 
 27
 We turn to our review of the district court's decision with these principles in mind. We can disturb the district court's decision only if its factual findings are clearly erroneous or if it committed an error of law. See Central Ave., 651 F.2d at 569.
 
 
 28
 After hearing testimony and receiving documentary evidence over a six-day period, the district court made two critical factual findings that persuaded it to issue the preliminary injunction:
 
 
 29
 Lewellen has demonstrated that the criminal prosecution initiated by Raff and Cahoon against Lewellen was brought in bad faith for the purpose of retaliating for the exercise of his constitutionally protected rights. This Court is of the opinion that the criminal charges instituted against Lewellen would not have been filed absent the desire to retaliate against Lewellen for exercising his federally protected rights.
 
 
 30
 Lewellen v. Raff, 649 F.Supp. 1229, 1232 (E.D.Ark.1986). Although the district court's opinion is somewhat cryptic as to the precise bases for these findings, based on our review of the record, we cannot say that they are clearly erroneous.
 
 
 31
 The allegations in Lewellen's complaint painted a picture of pervasive racism and discriminatory treatment of blacks in the Lee County court system. Lewellen alleged that he, as a black attorney, had received disparate treatment from that accorded white attorneys by both the prosecutors and the closely-aligned circuit court judges. He claimed that the prosecutors initiated charges against him: (1) because of his race; (2) because he had vigorously attempted to defend his client, Rev. Banks, against the rape charge; and (3) because they wished to thwart Lewellen's campaign for state office against a political ally of Sheriff May.
 
 
 32
 In support of these allegations, Lewellen presented the testimony of eight witnesses at the preliminary injunction hearing. The district court credited the testimony of Lewellen and Sam Blount, a local businessman, as supporting the allegation that the prosecution was initiated because of the prosecutors' desire to retaliate against Lewellen for his vigorous defense of Banks. The district court relied on the following evidence:
 
 
 33
 Lewellen testified that during jury selection in the rape case he was defending, he objected to the procedure being employed by the trial judge and received a strong admonishment from the trial judge in open court; that later, he saw the trial judge and Raff eating lunch together in the Lee County jail and advised the trial judge that he, Lewellen, wanted to renew his objections to the jury selection procedure when the trial resumed. Again the trial judge harshly rebuked Lewellen for questioning the judge's integrity. Lewellen states that this is the conduct that displeased Raff and the judge.
 
 
 34
 * * *
 
 
 35
 * * *
 
 
 36
 Lewellen also testified that Sheriff May advised him that he needed to take steps to apologize to the trial judge and Raff if he wanted, in effect, to get back in their good graces and minimize the consequences that could flow from Lewellen's criminal case.
 
 
 37
 * * *
 
 
 38
 * * *
 
 
 39
 Lewellen testified that Sheriff May advised him that he, Lewellen, should go to Raff and apologize and that he could avoid some of the difficulties confronting him. Lewellen further testified that Sheriff May said that in 1972, when May was under investigation by a Lee County Grand Jury, May went to Raff and apologized to Raff and "Gene fixed the Grand Jury."Lewellen, 649 F.Supp. at 1232 and n. 4, 1234.
 
 
 40
 The testimony of Sam Blount also supports the district court's finding of retaliatory prosecution. Blount testified that Sheriff May said, in effect, that criminal charges might be brought against Lewellen because the prosecutors were displeased by Lewellen's conduct of the defense of Banks in the state rape trial.[8]
 
 
 41
 As evidence that Lewellen's prosecution was initiated at least in part because Lewellen is black, the district court referred to the testimony of Neal, an attorney who had practiced law in Lee County for approximately seven years. Lewellen, 649 F.Supp. at 1233 n. 8. Neal testified about the disparate treatment black attorneys were subjected to by Raff and Cahoon. The district court also stated that "the evidence describe[s] an environment in which Lewellen will not be assured adequate vindication of due process and equal protection in the Lee County Circuit Court * * *." Id. at 1233.
 
 
 42
 Finally, as evidence that Lewellen's prosecution was motivated by the prosecutors' desire to retaliate for and discourage Lewellen's exercise of his first amendment rights, the district court found that:
 
 
 43
 the scheduling of Lewellen's criminal case for trial on October 10, 1986, for November 17, 1986, took place twenty-four (24) days prior to the General Election conducted on November 4, 1986, in which Lewellen was running as an Independent against a Democratic incumbent, when Lewellen was defeated. This Court is of the opinion that there is a strong likelihood that Lewellen can establish that his opponent in the senatorial race made reference to this scheduling during the campaign, and that the scheduling was calculated to impede and impair his First Amendment rights.
 
 Id. at 1232 n. 5.[9]
 
 44
 The state officials argue that all of these findings are clearly erroneous, or, even if not erroneous, irrelevant, because "[t]he sole issue before this Court is whether the prosecutors had a reasonable expectation of obtaining a valid conviction of Lewellen." We disagree with both assertions.
 
 
 45
 First, the district court's findings are not irrelevant. The "bad faith and harassment" exception to the Younger abstention doctrine is applicable when criminal prosecutions are instituted for impermissible purposes.[10] All of the district court's findings are directed toward that ultimate issue.
 
 
 46
 Moreover, it is of no significance that the district court's findings concerning the impermissible purposes behind the prosecution are irrelevant to the issue of whether the prosecutors had a reasonable expectation of obtaining a conviction. As stated by the Fifth Circuit, "[a] bad faith showing of this type [--retaliatory prosecution--] will justify an injunction regardless of whether valid convictions conceivably could be obtained." Fitzgerald, 636 F.2d at 945 (emphasis added); see also Bishop v. State Bar, 736 F.2d 292, 294 (5th Cir.1984); cf. Wilson v. Thompson, 593 F.2d 1375, 1387 (5th Cir.1979) (preliminary injunction of state criminal proceeding permissible if: (1) conduct retaliated against is constitutionally protected; and (2) prosecution is motivated at least in part by purpose to retaliate or deter). Because we find that the district court's finding of retaliatory prosecution is not clearly erroneous, we therefore need not and do not address the issue whether the prosecutors entertained a reasonable expectation of obtaining a conviction of Lewellen.
 
 
 47
 Second, we cannot agree with the state officials that the district court's findings are clearly erroneous. The district court credited the testimony of, among others, Lewellen, Neal, and Blount. As the Supreme Court has admonished,
 
 
 48
 [w]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.
 
 
 49
 Anderson v. City of Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 1513, 84 L.Ed.2d 518 (1985). We conclude that the district court's factual findings were not clearly erroneous and that they adequately support its decision to issue a preliminary injunction.
 
 
 50
 The state officials also argue that the district court applied an erroneous legal standard in deciding to issue the preliminary injunction. They claim that the district court employed the general Dataphase standard for assessing the propriety of injunctive relief rather than the more stringent standard required by Younger. See Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 114 (8th Cir.1981) (four considerations are irreparable harm, balance of harms, probability of success on merits, and public interest). We disagree.
 
 
 51
 We first note that other cases in this circuit have used the traditional preliminary injunction standard even in the Younger abstention context. See Munson v. Gilliam, 543 F.2d 48, 52 (8th Cir.1976) (in case where Younger abstention was at issue, court stated that "[t]he grant of a preliminary injunction requires a showing of a strong likelihood of eventual success on the part of the grantee and a showing of irreparable harm * * * .").
 
 
 52
 Moreover, the Younger standard and the general standard for injunctive relief are closely related, being based on similar equitable principles. They differ in that the Younger standard requires a showing of "great and immediate" irreparable injury. We agree with the state officials that the district court's opinion somewhat confusingly mingles discussion of the two standards. Nevertheless, the district court clearly applied the stringent "great and immediate irreparable injury" requirement, because it expressly made the factual findings necessary for a showing of great and immediate irreparable injury.
 
 
 53
 The state officials have also appealed from the district court's denial of their motion for summary judgment with respect to injunctive relief. For the foregoing reasons, we affirm this order.
 
 B. Prosecutorial Immunity
 
 54
 In an unpublished order issued one week after the preliminary injunction, the district court granted Raff and Cahoon absolute immunity from damages on Lewellen's defamation claim. The court also granted Raff and Cahoon qualified immunity with regard to causes of action arising out of their role in the electronic surveillance of Lewellen. Lewellen appeals from these orders.
 
 
 55
 Lewellen attempted to state a cause of action against Raff and Cahoon for defamation,[11] claiming that they were responsible for release and publication of the tape recordings that purportedly established Lewellen's participation in witness bribery. The district court found that "the information which [Lewellen] contends is defamatory was disclosed by Raff and Cahoon during judicial proceedings in connection with the Banks trial." Based on Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the district court concluded that the prosecutors were entitled to absolute immunity from damages on this claim. We agree.
 
 
 56
 In Imbler, the Supreme Court held that prosecutors are absolutely immune from damages claims arising out of their activities in initiating and presenting the state's case. Id. 424 U.S. at 431, 96 S.Ct. at 995. Here, the only evidence of release of the tapes by the prosecutors was that they played the tapes for Judge Yates during Rev. Banks's trial, so Judge Yates could decide if attempts had been made improperly to influence a witness. Such an activity is clearly "intimately associated with the judicial phase of the criminal process" and thus cannot give rise to prosecutorial liability. Id. at 430, 96 S.Ct. at 995.
 
 
 57
 Lewellen also claimed that prosecutors Raff and Cahoon directed and participated in the allegedly illegal electronic surveillance of him. The district court found that the prosecutors were not entitled to absolute immunity on this claim because the surveillance was "investigative rather than judicial in nature." The court found that the prosecutors were entitled to qualified immunity, however, because their conduct did not violate any clearly established law.
 
 
 58
 Lewellen contends that the district court erred in finding the prosecutors qualifiedly immune. The prosecutors respond that they should have been held entitled to absolute immunity, but, if not, then the court was correct in finding them qualifiedly immune. We agree with the prosecutors that they are entitled to absolute immunity on these claims.
 
 
 59
 Most of the allegations in Lewellen's complaint are facially insufficient to deprive the prosecutors of absolute immunity. The activities complained of--receiving complaints of criminal conduct, listening to tape recordings, reviewing statutes--are all part of a prosecutor's familiar and traditional role of reviewing evidence and deciding whether to initiate a prosecution. As such, they are absolutely shielded from giving rise to liability for damages. See Imbler, 424 U.S. at 430-31 and n. 33, 96 S.Ct. at 995 and n. 33.[12]
 
 
 60
 Lewellen's more problematic allegation is that Deputy Prosecutor Cahoon assisted personally in the surveillance and taping of Lewellen's and others' conversations. It is undisputed that Cahoon rode in the car with Sgt. Williams and Sheriff May when tapes E-1 and E-2 were made; Sgt. Williams operated the receiving and recording device. Sgt. Williams testified that at one point during the evening, when Mrs. Patterson left her house, wearing the microphone, to go to Lewellen's office, Cahoon joined Mrs. Patterson in her car and spoke with her.
 
 
 61
 Although it is a close question, we hold that Cahoon is entitled to absolute immunity for these activities, based on our recent decision in Williams v. Hartje, 827 F.2d 1203, 1210 (8th Cir.1987). In Williams, we held that a prosecutor was absolutely immune from damages for claims arising out of his interviews with prison inmates conducted to determine if they had any knowledge of the circumstances of the death of an inmate. The prosecutor's investigation was undertaken to obtain evidence for a coroner's inquest scheduled for the following day--a proceeding held by this court to be quasi-judicial in nature. We stated that "investigation to secure the information necessary to the prosecutor's decision to initiate criminal proceedings is within the quasi-judicial aspect of the prosecutor's job and therefore is absolutely immune from civil suit for damages." Id.
 
 
 62
 Cahoon's participation in the electronic surveillance of Lewellen falls squarely within the scope of this holding in Williams. Mrs. Patterson, a prosecution witness in a trial then being conducted by Cahoon, had alleged that various parties were attempting to bribe her; the electronic surveillance was conducted to determine whether criminal charges should be lodged against those parties. Moreover, Cahoon's actions were undertaken to protect Mrs. Patterson, a key witness at Rev. Banks's rape trial, and to insure her attendance and testimony at trial. These actions are also within the scope of a prosecutor's duties and thus can not give rise to liability for damages. See Myers v. Morris, 810 F.2d 1437, 1447 (8th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987); cf. Imbler, 424 U.S. at 430 n. 32, 96 S.Ct. at 995 n. 32 (efforts to control the presentation of witnesses' testimony fall within immunized prosecutorial functions). We hold, therefore, that prosecutors Raff and Cahoon are absolutely immune from liability for any damages caused by their participation in the investigation of Lewellen.[13]
 
 C. Immunity of Police Officers
 
 63
 Sgt. Williams and Sheriff May filed motions to dismiss or for summary judgment on the basis of qualified immunity. The district court in large part denied these motions, stating that "[t]he Court cannot find that [Williams and May] did not violate clearly established statutory and constitutional rights which a reasonable person would have known." Williams and May appeal from the denial of their motions; we reverse. We discuss their motions as they relate to each of the counts the district court did not otherwise dismiss.[14]
 
 
 64
 In Count One of his complaint, Lewellen purports to state causes of action under 42 U.S.C. Secs. 1981 and 1983, claiming that Williams and May violated his rights under the first, fourth, fifth, thirteenth, and fourteenth amendments by: (1) conducting an illegal search and seizure; (2) unlawfully arresting and prosecuting him; (3) violating his freedom to engage in his profession without discrimination due to his race; and (4) violating his rights of association and to be a candidate for public office.
 
 
 65
 The first claim, for illegal search and seizure, based on May's and Williams's roles in the tapings, must be dismissed. Lewellen claims that the electronic surveillance activities violated federal and state communications interception statutes. Yet the federal statute, 18 U.S.C. Secs. 2510-2520 (as amended through Supp.1986), was not violated because Mrs. Patterson, one of the parties to the conversations at issue, had consented to the interception.[15]
 
 
 66
 Lewellen argues further that the federal statute incorporates stricter provisions of state law, and that an Arkansas statute then in effect required judicial authorization prior to interception of communications. 1985 Ark. Acts 666, 707 (repealed 1986) (formerly codified at Ark.Stat.Ann. Secs. 41-4501-4509 (Supp.1985)). All parties concede that the tape recordings at issue did not have prior judicial authorization. The Arkansas statute was repealed and voided ab initio, however, one year after it was passed, see 1986 Ark. Acts 1, because the General Assembly determined that there was too much confusion over the meaning of the statute. Id. at Sec. 2. In such a case, it cannot be said that the statute represented "clearly established" law. Finally, "Fourth Amendment rights are not violated when * * * conversations with a government informant are electronically monitored by a government agent with the consent of the informant." United States v. McMillan, 508 F.2d 101, 104 (8th Cir.1974), cert. denied, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975). For these reasons, Lewellen's claims against May and Williams for illegal electronic surveillance must be dismissed.
 
 
 67
 The second claim, for unlawful arrest and prosecution, must be dismissed as to Williams because Lewellen did not allege or produce any facts to indicate that Williams was involved in these aspects of the investigation of Lewellen. In his brief, Lewellen argues that Williams created false evidence and destroyed exculpatory evidence "in order to maliciously prosecute Lewellen." Lewellen did not raise these allegations in his complaint, nor did he ever respond to Williams's motion for summary judgment, so this is the first time a court has been asked to rule on these claims. Likewise, Lewellen raises these allegations with respect to Sheriff May for the first time on appeal. In these circumstances, we decline to pass on claims that are raised for the first time on appeal, and Lewellen's claims for unlawful arrest and prosecution must fail.
 
 
 68
 Finally, Lewellen's third and fourth claims under this count must also be dismissed. Lewellen did not demonstrate any genuine issues of material fact to support his allegations that Williams and May deprived him of his freedom to engage in a profession and violated his right to be a candidate for political office; he does not even address these issues in his briefs on appeal. Lewellen asserts in his complaint that May "tried to convince [Lewellen] that he should not run for the State Legislature." Assuming this to be true, it does not rise to the level of a violation of Lewellen's first amendment rights. Count 1 must therefore be dismissed in its entirety as it applies to Williams and May.
 
 
 69
 Count Two of Lewellen's complaint alleged that Williams and May violated 42 U.S.C. Secs. 1983 and 1985 by conspiring to entrap him in frivolous criminal charges and to cover up that conspiracy, for the purpose of depriving him of equal protection due to his race. Without detailing all of the arguments made by the parties with respect to this issue, we find that Lewellen failed to satisfy his burden, as the nonmoving party, to survive a motion for summary judgment. Because Lewellen's section 1985 claim must be dismissed, his section 1986 claim against May, contained in Count 3, must likewise be dismissed. See Kaylor v. Fields, 661 F.2d 1177, 1184 (8th Cir.1981) (cause of action under Sec. 1986 is dependent on valid claim under Sec. 1985).
 
 
 70
 The final claim that survived Williams's and May's motions was that Williams and may conspired with other defendants to deprive Lewellen of equal protection and hinder him from obtaining a fair trial, in violation of 42 U.S.C. Sec. 1985(2). Underlying this claim is Lewellen's assertion that Williams and May threatened Joe Patterson, a possible defense witness in Lewellen's state criminal case. According to Lewellen, Williams and May threatened Joe Patterson with charges of bribery and perjury in an attempt to intimidate and coerce him into making false incriminating statements against Lewellen.[16]
 
 
 71
 This claim must fail, however, because Lewellen has not alleged or produced any facts to demonstrate that such witness intimidation, if it occurred, was prompted by a racial or class-based invidiously discriminatory animus. See Kush v. Rutledge, 460 U.S. 719, 725, 103 S.Ct. 1483, 1487, 75 L.Ed.2d 413 (1983). We note, moreover, that Lewellen has failed to argue in support of or even mention this claim in his briefs.
 
 III. Conclusion
 
 72
 We affirm the district court's grant of a preliminary injunction; a hearing on Lewellen's claim for a permanent injunction should be held promptly. We hold that prosecutors Raff and Cahoon are absolutely immune from liability for damages, and affirm the protective order limiting discovery against them. Finally, we reverse the denials of Williams's and May's motions for summary judgment, finding that they are entitled to qualified immunity on all counts.
 
 
 
 [1]
 The Honorable George Howard, Jr., United States District Judge for the Eastern District of Arkansas
 
 
 [2]
 Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)
 
 
 [3]
 Mrs. Patterson is referred to both as Lafayette and Lafayetta in the record and in the parties' submissions
 
 
 [4]
 The relevant portion of that tape, identified as "E-2," contains the following conversation:
 BL [Lewellen]: * * * Reverend, it is the understanding that you and your wife are going to go somewhere. Is that ya'll's understanding?
 AB [Rev. Banks]: I'm sticking by my commitment.
 BL: The commitment is, and what I have heard her say is that what she wants from you, and that thing being gone. I don't want you moving tomorrow. That's what I'm saying, and because that is going to bring up some bunch of suspicion, okay? We don't want that. We need time.
 AB: We need time to relocate.
 BL: You see what I am saying and the word and wait, and it is this. What we talk about here will never go any further. That is a solemn word on everybody's part, okay? And I said that because it is not going to do any one person any good to try to embarrass the other, and it is just going to raise something else up again, and then we are all in this mess over again, so if ya'll are sincere in what your agreement and you are making, that is fine with me.
 MB [Margie Banks]: That's right. It ain't nobody's business.
 BL: There was also some understanding that she feels that there is some reimbursement necessary for attorney fees. That's what your brother advises on the telephone. I think you agree to that; is that right?
 AB: That's correct.
 BL: Okay, and that is $500.00 and she has both of ya'll word.
 MB: Uh huh (yes).
 BL: That is all to be done; is that right? Is that right, Reverend?
 AB: That's right.
 * * *
 BL: * * * Like I say, ya'll know what your agreement are; ya'll don't need me, and that is why I'm telling you that if you are going to work it, work it amongst your family so that is what it will be. The least that I have involvement in it the better because I swear to God, I don't put nothing past folks, and if they ever felt that I was intimidating anybody or trying to persuade to a witness out or something or do some stuff like that, Gene Raff--and I am going to be honest with you--that white man and me have mixed up some bad blood these last three days. It has almost gotten down to some plain out cussing. I mean it has been bad, so anything that he could right now at this point to use against me or hurt me, he would do it. It has gotten past a job to him and gotten personal; him and David--it has got past that, and anything they could do--They would send somebody wired up with tape recorders on them. I'm serious. I'm telling you, you have to watch it. If you don't believe it, just ask Jimmie Wilson, cause I'd always believe they done put folks on him. I don't want them with me standing in front of a grand jury saying I been over there siminating(?) somebody and all that kind of stuff. That's what they would do.
 
 
 [5]
 The Arkansas witness bribery statute, Ark.Stat.Ann. Sec. 5-53-108 (1987), provides in pertinent part:
 (a) A person commits witness bribery if:
 (1) He offers, confers, or agrees to confer any benefit upon a witness or a person he believes may be called as a witness with the purpose of:
 (A) Influencing the testimony of that person; or
 (B) Inducing that person to avoid legal process, summoning him to testify; or
 (C) Inducing that person to absent himself from an official proceeding to which he has been legally summoned * * *.
 
 
 [6]
 Lewellen sought only declaratory and injunctive relief against Judge Wilkinson
 
 
 [7]
 In Sec. 1983 cases such as this one, the doctrine is not grounded in the Anti-Injunction Act, 28 U.S.C. Sec. 2283 (1982), which prohibits federal injunctions against state court proceedings, because actions brought under Sec. 1983 are within the "expressly authorized" exception to the ban on federal injunctions. See Mitchum v. Foster, 407 U.S. 225, 243, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705 (1972)
 
 
 [8]
 The questioning of Sam Blount was as follows:
 Q. [By Mr. Hairston, attorney for Lewellen] Okay. Now, you had a discussion about some potential charges, then, with Sheriff May?
 A. That's correct.
 Q. Did Sheriff May indicate to you why such charges might be brought against plaintiff Lewellyn [sic]?
 A. Yes, he did.
 Q. And what did he say?
 A. The sheriff explained when I was in his office that attorney Lewellyn [sic] had a manner the day before or couple days before during a court session that was very much unprofessional and unruly for a court or for a court officer.
 Q. Now, did you execute an affidavit in this matter?
 A. Yes, sir, I did.
 Q. Do you recall what you put in that affidavit?
 A. Yes, sir.
 Q. What was that, sir?
 A. That the sheriff emphasized, his emphasis were that he was very, very disappointed and that he thought that Bill had done some things that would cause the prosecutor of our county, as well as the judge, to not cooperate with him during the court session. I understand that they were overruling all of attorney Lewellyn's [sic] objections, and that was basically how I received, from my intelligence, that was the payback situation.
 Q. Did he indicate to you that the conduct of Mr. Lewellyn [sic] during that court session you referred to towards defendant Raff and Cahoon might cause some problems for Mr. Lewellyn [sic], some legal problems for Mr. Lewellyn [sic]?
 A. Yes, sir, that he very well may be charged.
 Q. Okay. Do you remember any specific language that Sheriff May used in terms to indicate the nature of the conduct?
 A. Yes, sir, I think he said he had shown his butt in the courtroom, how he had acted and that he had pissed everybody off. And I think that "everybody" was to include the officers of the court, the prosecutor, deputy prosecutor and the judge.
 Q. What was the payback situation, sir?
 A. That was the lack of cooperation by anybody that day because of how attorney Lewellyn [sic] had acted.
 Q. Would you repeat that?
 A. The statement was made that all of his objections were overruled. I'm not an attorney so I'm just trying to relate it how I recollect it. That all of his objections were overruled and that he was not able to get anything across during the court session because of how he had act, and that was kind of the payback to the point that the court was not listening to anything attorney Lewellyn [sic] was saying.
 * * *
 Q. Was there any discussion concerning any possible criminal charges that might be brought against Mr. Lewellyn [sic]?
 A. I think it was--I think the statement was insinuated by the sheriff that there were possibly some charges that may be brought against attorney Lewellyn [sic] unless he rectified the situation by going back and making an apology is what I think that the intentions were.
 Transcript at 275-77.
 The district court did not specifically refer to this testimony in its opinion; nevertheless, it is our duty to examine the entire record to determine if the district court's finding of retaliatory prosecution is clearly erroneous. See, e.g., Anderson v. City of Bessemer City, 470 U.S. 564, 574-75, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).
 
 
 [9]
 We note that it is not clear that Lewellen would be able to raise these issues as defenses to a witness bribery charge. Cf. Kaylor v. Fields, 661 F.2d 1177, 1182 (8th Cir.1981)
 
 
 [10]
 In a thorough and thoughtful opinion, H. Lee Sarokin, a distinguished federal district judge, recently surveyed the types of impermissibly-motivated state prosecutions that have been held enjoinable under the bad faith exception to the Younger doctrine:
 courts have found bad faith where prosecutors have instituted charges in violation of a prior immunity agreement, Rowe v. Griffin, 676 F.2d 524 (11th Cir.1982); where a prosecutor has pursued highly questionable charges against the plaintiff apparently for the sole purpose of gaining publicity for himself, Shaw v. Garrison, 467 F.2d 113 (5th Cir.), cert. denied, 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317 (1972); where a prosecution is motivated by a purpose to retaliate for or to deter the filing of a civil suit against state officers, Wilson v. Thompson, 593 F.2d 1375 (5th Cir.1979); and, specifically, where a prosecution has been instituted to harass and punish the federal plaintiffs for having exercised their first amendment rights in criticizing public officials. Fitzgerald v. Peek, 636 F.2d 943 (5th Cir.) (per curiam), cert. denied, 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981); see also Herz v. Degnan, 648 F.2d 201, 209-10 (3d Cir.1981) (state Attorney General's institution of license revocation proceeding on grounds for which no authority existed strongly suggested that "bad faith" exception to Younger principle would apply, if Younger were relevant to proceeding in question); Bishop v. State Bar of Texas, 736 F.2d 292 (5th Cir.1984); Heimbach v. Village of Lyons, 597 F.2d 344, 347 (2d Cir.1979); Timmerman v. Brown, 528 F.2d 811 (4th Cir.1975). The threat of multiple prosecutions may be additional evidence of bad faith, see, e.g., Krahm v. Graham, 461 F.2d 703 (9th Cir.1972), but is not inevitably required to establish bad faith. Fitzgerald v. Peek, 636 F.2d at 944; Wilson v. Thompson, 593 F.2d at 1381. An injunction may also issue to enjoin consideration of charges by a demonstrably biased tribunal. Gibson v. Berryhill, 411 U.S. 564, 577, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1973).
 Wichert v. Walter, 606 F.Supp. 1516, 1521 (D.N.J.1985).
 
 
 [11]
 Lewellen refers to this cause of action as "federal defamation," but we do not address his assertion that "defamation plus the violation of a substantive Due Process right states a claim under section 1983."
 
 
 [12]
 Two more troublesome allegations may be disposed of quickly because there is simply no evidence in the record that Raff ordered the initial electronic surveillance or directed that the state police should use electronic surveillance. The record indicates that it was Sheriff May's decision to request that devices for electronic surveillance be brought by the state police. Similarly, the testimony of Sgt. Williams indicates that it was his idea, during conversation with Raff, that a telephone conversation between Lewellen and Mrs. Patterson be recorded. Thus, Lewellen cannot avoid summary judgment against him on these claims because he produced no genuine material facts to substantiate his allegations
 
 
 [13]
 Lewellen also suggests in his brief that Raff and Cahoon are not entitled to immunity because they somehow participated in the alleged "editing" of tape E-1. He urges us to "infer" that Raff and Cahoon ordered or consented to this alleged editing, which purportedly resulted in the destruction of exculpatory evidence and the creation of incriminating evidence. Lewellen did not raise this allegation in his complaint, nor was it discussed at all in the parties' briefs to the district court on the immunity issue. The district court therefore has never ruled on this claim and it would be inappropriate for us to do so. The proper course would have been for Lewellen to amend his complaint; having failed to do so, he may not on appeal raise new claims. See, e.g., Spear v. Dayton's, 771 F.2d 1140, 1144 (8th Cir.1985)
 Lewellen also appeals from the district court's order barring discovery against Raff and Cahoon except as to one limited issue. We affirm this order because we have determined that Raff and Cahoon are entitled to absolute immunity and because Lewellen has made no showing that he was prejudiced by the order. See, e.g., Voegeli v. Lewis, 568 F.2d 89, 96 (8th Cir.1977) (district court's discovery rulings not reversible unless shown to be a gross abuse of discretion resulting in fundamental unfairness).
 
 
 [14]
 The district court granted Williams's and May's motions to dismiss Lewellen's punitive damages and state tort claims, and claims under the federal communications interception statute. Although the court went on to say that it was not dismissing the claims against Williams and May under Count 7, the only claims contained in Count 7 were brought under the federal communications interception statute. We therefore dismiss Count 7 as it applies to Williams and May
 
 
 [15]
 18 U.S.C. Sec. 2511(2)(c) provides:
 It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.
 
 
 [16]
 These allegations do not state a claim under the first clause of Sec. 1985(2), which makes it unlawful for "two or more persons in any State or Territory [to] conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully." See Kush v. Rutledge, 460 U.S. 719, 721 n. 1, 103 S.Ct. 1483, 1485 n. 1, 75 L.Ed.2d 413 (1983) (first clause of Sec. 1985(2) relates to witness intimidation in connection with federal proceedings). They do, however, state a claim under the second clause of Sec. 1985(2), which makes it unlawful for "two or more persons [to] conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws * * *." See id. (second clause of Sec. 1985(2) applies to witness intimidation in state court proceedings)
 In Deretich v. Office of Administrative Hearings, 798 F.2d 1147, 1153 (8th Cir.1986), this court stated that "section 1985(2) does not provide a cause of action for intimidation of witnesses in state administrative and court proceedings." That statement must be understood in the context of that case, however; no racial or class-based discriminatory animus had been shown there.