**Fred W. PHELPS, Sr., Jonathan B. Phelps, Karl D. Hockenbarger, Charles R. Hockenbarger, Timothy B. Phelps, and Margie J. Phelps, Plaintiffs,**

**v.**

**Joan HAMILTON, in her official capacity as District Attorney, Defendant.**

No. 93–4148–SAC.

United States District Court, D. Kansas.

Dec. 23, 1993.

Elizabeth M. Phelps, Phelps, Chartered, Margie J. Phelps, Topeka, KS, for plaintiffs.

Deanne W. Hay, Myron L. Listrom, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Carol R. Bonebrake, Office of Atty. Gen., Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The plaintiffs bring this latest action asking the court for declaratory and injunctive relief from criminal prosecutions arising from their anti-homosexual picketing and from certain criminal statutes which allegedly threaten their anti-homosexual picketing. The plaintiffs regularly picket outside churches and public buildings, in parks, and at funerals. They picket in opposition to homosexuality and to society's tolerance and commendation of homosexuality. The messages on their picket signs are often seen as controversial and disturbing. Examples of such messages are: "God Hates Fags," "Fags Burn in Hell," "Fags Hate God," and "Fags are Worthy of Death." The plaintiffs also carry signs with messages that may have a meaning beyond their ardent opposition to homosexuality and, thus, are not as appalling to the public. These signs include: "Fear God," "Turn or Burn," "Go and Warn Them," and "Hate is a Bible Value."

Each of the plaintiffs is criminally charged in state court for conduct taken during or

shortly after one or more anti-homosexual picketing events. The plaintiffs seek to have these state prosecutions declared unconstitutional and all future prosecutions by the defendant enjoined. The plaintiffs also challenge the constitutionality of the Kansas Funeral Picketing Act, K.S.A.1992 Supp. 21–4015. The plaintiff Fred Phelps, Sr. additionally challenges the constitutionality of the Kansas Anti–Stalking Statute, 1993 Kan. Sess.Laws Ch. 291, § 253, and the Kansas Telephone Harassment Statute, K.S.A. 21–4113, as amended to include telefacsimile communications, 1992 Kan.Sess.Laws Ch. 298, § 79.

Upon filing their action, the plaintiffs also moved for a preliminary injunction (Dk. 2). By order filed August 25, 1993, the court continued the hearing on the preliminary injunction request until the following three issues were submitted and decided on summary judgment motions:

I. Should the court abstain from deciding whether the pending criminal prosecutions against the plaintiffs violate the plaintiffs' First Amendment rights or are brought in bad faith?

II. Do the plaintiffs have standing to challenge the facial constitutionality of the Kansas Anti–Stalking Statute, 1993 Kan. Sess.Laws Ch. 291, § 253; the Kansas Telephone Harassment Statute, K.S.A. 21–4113, as amended to include telefacsimile communications, 1992 Kan.Sess.Laws Ch. 298, § 79; and the Kansas Funeral Picketing Act, K.S.A.1992 Supp. 21–4015?

III. Whether the same Kansas statutes listed in Issue II are facially unconstitutional?

(Dk. 14 at 3–4). Both sides filed their motions and responses within the dates set by the court. The parties were allowed to supplement their motions after the plaintiffs filed their second amended complaint adding two parties and allegations. The summary judgment motions are now ripe, the court is ready to rule. The parties agree the court's ruling will be controlling over all the parties and claims found in the second amended complaint.

## Summary Judgment Standards

■ The court shall grant a motion for summary judgment when a genuine issue of material fact does not exist and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The movant's burden under Rule 56 of the Federal Rules of Civil Procedure is to lay out the basis of its motion and to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If the moving party meets its burden, then it becomes the nonmoving party's burden to show the existence of a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.* 939 F.2d 887, 891 (10th Cir.1991). When the nonmoving party will have the burden of proof at trial, " 'Rule 56(e) ... [then] requires the nonmoving party to go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun*, 956 F.2d 949, 951 (10th Cir.1992) (citations omitted).

■ The defendant properly takes issue with the plaintiffs' failure to comply with D.Kan. Rule 206. In several instances, the plaintiffs' statement of facts is not concise, is not broken down into separately numbered paragraphs, and is not supported by specific references to portions of the record. Besides these deficiencies, the plaintiffs interspersed their statement with footnotes. These deficiencies and the footnotes increase the opposing party's burden in controverting the facts and unduly complicate the court's task in discerning what facts are uncontroverted. Finally, the court strongly discourages any effort to circumvent page limitations through

unnecessary footnotes or a reduced type size. Briefs using such a "favorite undergraduate gambit" may be struck in the court's discretion. *See, e.g., TK–7 Corp. v. Estate of Barbouti,* 966 F.2d 578, 579 (10th Cir.1992). The court admonishes the plaintiffs that in the future it will not tolerate a brief that fails to comply with basic requirements or employs undergraduate gambits.

■ Without asking leave of the court, the plaintiffs purport to incorporate the entire evidentiary and factual record from the case, *Phelps, et al. v. Hamilton,* 828 F.Supp. 831 (D.Kan.1993), by reference in their brief here. This practice of preemptory incorporation is unacceptable. When it comes to summary judgment motions, the facts shall be presented by affidavit, declaration under penalty of perjury, and/or relevant portions of pleadings, depositions, answers to interrogatories and responses to requests for admissions. All of these matters are to be attached to the party's memorandum. *See* D.Kan.Rule 206(c). Relief from this requirement comes from the court. The court construes the plaintiffs' statement of incorporation as a request to take judicial notice of the record in 828 F.Supp. 831. The court grants the request because the facts and issues in both cases are closely related, because the defendant had an ample opportunity to controvert the material facts in that case, and because the parties and the court would save time and expense through this incorporation.

■ The plaintiffs argue the court should give collateral estoppel effect to certain of its legal conclusions and factual findings made in the order filed July 2, 1993, in 828 F.Supp. 831. According to the plaintiffs, the court in that order found that there was evidence that the defendant was acting in bad faith in prosecuting the plaintiff Fred Phelps and that the plaintiff Ed Engel had standing to challenge the criminal defamation statute. Affirmative collateral estoppel is not available to the plaintiffs for the court did not make any final finding on issues directly applicable to the present proceeding. As to the issue of bad faith, the court concluded that the defendant was not entitled to summary judgment on abstention for the plaintiff

Phelps had come forth with sufficient evidence to raise a genuine issue of material fact regarding the defendant's motive in prosecuting the pending state criminal defamation cases. As for Engel's standing, the court again denied the defendant summary judgment on this issue as the plaintiff Engel had come forth with sufficient evidence for a court to find in his favor. Neither ruling was the result of a full litigation of the facts. The denial of summary judgment "is strictly a pretrial order that decides only one thing— that the case should go to trial." *Switzerland Cheese Ass'n, Inc. v. E. Horne's Mkt., Inc.,* 385 U.S. 23, 25, 87 S.Ct. 193, 195, 17 L.Ed.2d 23 (1966). Neither ruling is of the type or nature that can be used affirmatively to preclude litigation over the issues in this case. The plaintiffs' collateral estoppel argument is without merit.

■ Finally, the defendant correctly points out that several of the plaintiffs' statements are not supported by exhibits meeting the requirements of Rule 56(c) and (e). In most instances, the exhibits, such as photographs, summaries and unofficial transcripts, are not properly authenticated by a Rule 56(e) affidavit. Additionally, many of the exhibits, like the newspaper articles, lack a foundation and are inadmissible hearsay. The court sustains the defendant's objections and will not consider those exhibits failing Rule 56 standards.

### Uncontroverted Statement of Facts

For purposes of these motions, the court accepts the following facts as uncontroverted:

1. The plaintiff Fred W. Phelps, Sr., a resident of Kansas, is an Old School Baptist preacher serving the Westboro Baptist Church in Topeka, Kansas.

2. The plaintiffs, Jonathan B. Phelps, Timothy B. Phelps and Margie J. Phelps, are residents of Kansas and members of the Westboro Baptist Church. They are also children of the plaintiff Fred W. Phelps, Sr.

3. The plaintiffs, Karl D. Hockenbarger and Charles F. Hockenbarger, are residents of Kansas and members of the Westboro Baptist Church. Charles is Karl's eldest son.

4. Each of the plaintiffs engages in anti-homosexual activity, including daily pickets. Their activities are ongoing and have been the topic of extensive media and community attention.

5. The defendant Joan Hamilton is a resident of Kansas. Elected in 1989, the defendant served two years, 1991 and 1992, in the Kansas House of Representatives. She was elected District Attorney for the Third Judicial District, Topeka, Kansas, in November of 1992 and assumed that position on January 11, 1993.

6. The defendant Hamilton is currently prosecuting criminal cases against each of the plaintiffs. The cases arise from actions the plaintiffs took during or immediately following anti-homosexual pickets. The pending criminal cases include:

a. *State v. Fred Phelps, Sr.*, No. 93–CR–326. On February 17, 1993, the defendant Hamilton filed *count one* charging Fred Phelps, Sr. with disorderly conduct for calling Jerry Palmer a "fat ugly sodomite" on March 27, 1992, while picketing. The defendant Hamilton filed on June 22, 1993, *count two* charging Fred Phelps, Sr. with aggravated intimidation of a witness, Jerry Palmer, on or about June 18, 1993, by constant harassing and displaying an offensive picket sign which read: "Pig Palmer FUS" and attached to this sign was another that said "Gays are Worthy of Death" and on the other side "God Hates Fags." The defendant on July 15, 1993, filed *count three* charging Fred Phelps, Sr. again with aggravated intimidation of Jerry Palmer on June 27, 1993, for the same conduct and picket signs.

b. *State v. Jonathan B. Phelps*, No. 93–CR–274. On February 9, 1993, the defendant filed a single count criminal complaint against Jonathan Phelps that charged him with assaulting Joshua Shaw on December 27, 1992. Immediately following an anti-homosexual picket in Gage Park, Phelps allegedly threatened to do bodily harm to Shaw while displaying a long wooden stick.

c. *State v. Jonathan Baxter Phelps*, No. 93–CR–1966. On July 15, 1993, the defendant filed two counts of aggravated intimidation of a witness against Jonathan

Phelps for displaying signs in the presence of Jerry Palmer that carried the same message for which Fred Phelps is charged in case No. 93–CR–326.

d. *State v. Charles F. Hockenbarger and Karl D. Hockenbarger*, Nos. 92–CR–3172 and 92–CR–3173. On December 22, 1992, nineteen days before the defendant took office as District Attorney, the former District Attorney Gene Olander filed a criminal complaint against Charles F. Hockenbarger and Karl D. Hockenbarger. Both are charged with one count of battery in unlawfully and intentionally touching Robert Cooper on August 30, 1992, while picketing.

e. *State v. Charles E. Hockenbarger*, No. 93–CR–276. On February 9, 1993, the defendant filed a single count criminal complaint against Charles E. Hockenbarger charging him with criminal damage to property for kicking Joshua Shaw's car, a 1981 Pontiac Firebird, on December 27, 1992, causing less than $500 in damage. This event allegedly occurred shortly after a picket in Gage Park.

f. *State v. Margie J. Phelps*, No. 93–CR–2831. On October 7, 1993, the defendant filed a single count criminal complaint charging Margie J. Phelps with falsely reporting that Rev. William G. Weeks had committed aggravated battery against several picketers.

g. *State v. Jonathan B. Phelps, Charles F. Hockenbarger, and Tim Phelps*, Nos. 93–CR–2833, 93–CR–2834, and 93–CR–2836. On October 7, 1993, the defendant filed these criminal cases charging each of the named plaintiffs with one count of battery and one count of unlawful restraint for grabbing the Rev. William G. Weeks, pushing him to the ground, and holding him down until the Topeka Police arrived.

h. *State v. Karl D. Hockenbarger*, No. 93–CR–2835. On October 7, 1993, the defendant filed a criminal complaint charging Karl D. Hockenbarger with the same two counts as described in the prior paragraph and with an additional count of battery for allegedly grabbing and knocking down Bryce Cripps who was attempting to help Rev. Weeks. The charges described in

paragraphs f, g and h arise from events occurring on September 5, 1993, while the plaintiffs were picketing the Rev. Weeks' church.

7. The Kansas Funeral Picketing Act, K.S.A.1992 Supp. 21–4015, was passed during the 1992 Kansas legislative session and became effective on April 30, 1992. The Kansas Legislature passed this Act in response to the funeral picketing activities of Westboro Baptist Church members.

8. On May 18, 1992, the Kansas Attorney General issued an opinion finding that the Kansas Funeral Picketing Act was constitutional. He concluded that the Act was content neutral and would prohibit only that picketing which is focused on the people attending the funeral. "In other words, picketing that is aimed at the public in general occurring in the general area surrounding the funeral rather than solely in the immediate vicinity of the funeral, and during a time period other than immediately proceeding and succeeding the funeral cannot be prohibited." The Attorney General further opined that the Act must be "narrowly construed to prohibit picketing only at times before, during and after the funeral when the funeral goers are present, arriving, attending or departing from the funeral sight."

9. In July of 1993, the plaintiffs asked the defendant to give an advisory interpretation of the Kansas Funeral Picketing Act regarding the time limits for picketing activities. The defendant refused the plaintiffs' request. The plaintiffs proceeded with their planned funeral picket relying instead on a statutory interpretation given by the Acting Chief of the Topeka Police Department.

10. In September of 1993, the Sedgwick County District Attorney's office declined a similar request from the plaintiffs for an advisory opinion. The Wichita Police Department also refused to fix a time frame for the funeral picketing and said the Act would be enforced. Based upon these representations, the plaintiffs' planned funeral picket in Wichita did not take place.

11. In its 1992 session, the Kansas Legislature amended the Kansas Telephone Harassment Statute, K.S.A. 21–4113, to include telefacsimile communications. During 1992 session meetings of the House Judiciary Committee, the defendant Hamilton in her capacity as a representative requested introduction of a bill that would include facsimile equipment within the telephone misuse statute. She later moved for an amendment to SB358 accomplishing this, and the motion carried the Committee. The Kansas Legislature passed SB358 as amended, and the new provisions became effective July 30, 1993, after some technical amendments during the 1993 session.

12. Also during its 1992 session, the Kansas Legislature passed the Kansas Anti–Stalking Statute which became effective on July 1, 1993, and appears at 1993 Kan.Sess. Laws Ch. 291, § 253.

13. The defendant Hamilton has not charged and has no pending complaints against any of the plaintiffs alleging a violation of the Kansas Funeral Picketing Act, the Kansas Anti–Stalking Statute, or the Kansas Telephone Harassment Statute.

**I. Should the court abstain from deciding whether the pending state criminal prosecutions against the plaintiffs violate the plaintiffs' First Amendment rights or are brought in bad faith?**

In the earlier case, *Phelps v. Hamilton*, 828 F.Supp. 831, 841–43 (D.Kan.1993), this court set out in some detail the *Younger* abstention doctrine, its purposes, and its exceptions. Since that order, nothing significant has been added to the relevant law. Instead of restating the general abstention principles, the court will extend its discussion of the bad faith exception to *Younger* abstention and then consider the defendant's current arguments for not applying this exception.

■ A federal court should not enjoin a pending state criminal prosecution absent a "showing of bad faith, harassment, or any other unusual circumstance that would call for equitable relief." *Younger v. Harris*, 401 U.S. 37, 54, 91 S.Ct. 746, 755, 27 L.Ed.2d 669 (1971). Though the expense and inconvenience of defending a criminal charge may be an irreparable injury, federal equitable relief is not available. *Id.* at 46, 91 S.Ct. at 751.

Federal intervention is appropriate only when the irreparable injury is "both great and immediate" such that "the threat to the plaintiff's federally protected rights ... cannot be eliminated by his defense against a single criminal prosecution." *Id.* These "exceptions provide a very narrow gate for federal intervention." *Arkebauer v. Kiley,* 985 F.2d 1351, 1358 (7th Cir.1993).[1]

■ Though the courts have grappled with these exceptions on several occasions, they have eluded any distinct or precise formulations. *Id.* For example, there is disagreement over the fundamental question whether "bad faith" and "harassment" are one or two concepts. 17A Charles A. Wright, et al., *Federal Practice and Procedure* § 4255 at 253 (1988). Justice Black referred separately to the terms in *Younger,* 401 U.S. at 50, 54, 91 S.Ct. at 753, 755, and in *Perez v. Ledesma,* 401 U.S. 82, 694, 91 S.Ct. 674, 119, 27 L.Ed.2d 701 (1971), as did Justice Rehnquist in *Juidice v. Vail,* 430 U.S. 327, 338, 97 S.Ct. 1211, 1218, 51 L.Ed.2d 376 (1977) and in *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 611, 95 S.Ct. 1200, 1211, 43 L.Ed.2d 482 (1975). Logically, bad faith refers to an improper motive, and harassment is just one kind of an improper motive. The overlap between the two concepts seems obvious. As used in the context of *Younger* exceptions, their use is not so plain. The Supreme Court has said that "prosecutorial bad faith ... in this context generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction." *Kugler v. Helfant,* 421 U.S. 117, 126 n. 6, 95 S.Ct. 1524, 1531 n. 6, 44 L.Ed.2d 15 (1975) The Court in *Kugler* was not giving "bad faith" an exclusive definition but was trying to identify a common method of proving bad faith using the objective standard of a "reasonable expectation." Apart from this definition, "bad faith" also should submit to proof of discriminatory intent, as in prosecutions pursued in retaliation for or to harass or to deter the defendant's exercise of constitutionally protected rights. *See Perez v. Ledesma,* 401 U.S. at 118 n. 11, 91 S.Ct. at 694 n. 11 (Brennan, J., concurring) ("Bad-faith harassment can, of course take many forms, including arrests and prosecutions under valid statutes where there is no reasonable hope of obtaining a conviction, ..., and a pattern of discriminatory enforcement designed to inhibit the exercise of federal rights...." (citations omitted)). As a practical matter, it is not significant whether "bad faith" and "harassment" are one or two concepts, unless one wants to read the *Kugler* definition as the only way to prove bad faith. Because the court chooses against such a restricted approach to the bad faith exception, the question is left for the academicians.

Since its *Younger* decision, the Supreme Court has not found the bad faith exception applicable in a case before it. The Court in *Younger* held out *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), as an example of an exceptional case justifying federal intervention. In *Dombrowski,* the plaintiffs, civil rights activists, alleged the criminal charges were not brought against them with a reasonable expectation of obtaining a valid conviction but to harass and discourage them in their efforts to secure the constitutional rights of black citizens in Louisiana. 380 U.S. at 482, 85 S.Ct. at 1118. The plaintiffs further said that they could prove their offices had been raided and documents seized pursuant to warrants which were later quashed and that the prosecutors threatened new prosecutions based in part upon the illegally seized documents. 380 U.S. at 482, 489, 85 S.Ct. at 1118, 1122. In sum, three circumstances in *Dombrowski* existed which distinguish it from *Younger:* (1) a prosecution brought without the reasonable expectation of a conviction; (2) a prosecution motivated to discourage constitutionally protected activity; and (3) the prosecution threatened to bring more indictments.[2]

---

1. "Except in the most extraordinary cases, a federal court must presume that state courts, consistent with the imperatives of the Supremacy Clause, *see* U.S. Const. art. VI, are fully competent to adjudicate federal constitutional and statutory claims properly presented by the parties." *Casa Marie, Inc. v. Superior Court of Puerto Rico,*

988 F.2d 252, 262 (1st Cir.1993) (citations and footnote omitted).

2. After separating out these distinguishing elements from *Dombrowski,* one commentator raised the questions: "Must all three elements be present before an exception to *Younger* may be

These circumstances show the plaintiffs in *Dombrowski* faced more than the irreparable harm of defending against a single criminal prosecution. *Younger*, 401 U.S. at 48, 91 S.Ct. at 752.

■ In *Kugler v. Helfant*, the Supreme Court abstained under the *Younger* doctrine to intervene in a state prosecution against a municipal court judge. 421 U.S. at 121, 95 S.Ct. at 1529. The plaintiff judge alleged the criminal prosecution against him resulted from his grand jury testimony that had been coerced by the Justices of the New Jersey Supreme Court. *Id.* The plaintiff insisted that he could not receive a fair trial in a New Jersey court because of the Justices' personal involvement in his case. 421 U.S. at 126 n. 6, 95 S.Ct. at 1531 n. 6. The Court disagreed with the plaintiff's choice of the bad faith exception rather than the extraordinary circumstances exception. *Id.* The Court said there was nothing to support a "bad faith" finding. *Id.* The Court then found that the circumstances were not so extraordinary as to render the state court incapable of adjudicating the federal issues and to justify a federal injunction. *Id.* at 126 n. 6, 130–31, 95 S.Ct. at 1531 n. 6, 1533–34. While an example of what does not constitute an extraordinary circumstance, *Kugler* does not require a plaintiff alleging prosecutorial bad faith to also prove that the state court is an inadequate forum.

■ In *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), the defendants acting pursuant to a search warrant and later a court order seized all copies of the film "Deep Throat." Instead of appealing the order to seize, the theater and its employees filed suit in federal court. The Supreme Court held that the district court's findings of a "pattern of seizure" and other evidence were vague and conclusory and did not support invoking the bad faith exception. The Court said:

Yet each step in the pattern of seizures condemned by the District Court was authorized by judicial warrant or order; and the District Court did not purport to invalidate any of the four warrants in any way, to question the propriety of the proceedings in the Superior Court, or even to mention the reversal of the suppression order in the Appellate Department of that court. Absent at least some effort by the District Court to impeach the entitlement of the prosecuting officials to rely on repeated judicial authorization for their conduct, we cannot agree that bad faith and harassment were made out.

422 U.S. at 351, 95 S.Ct. at 2293. As far as the bad faith exception, *Hicks* requires that such a finding be based on more than a mere pattern of searches conducted pursuant to judicial order without cause or reason to question the lawfulness of the order. *See Law Firm of Daniel P. Foster v. Dearie*, 613 F.Supp. 278, 281 (E.D.N.Y.1985).

In *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), the federal plaintiffs disobeyed subpoenas to appear in supplemental proceedings brought by judgment creditors attempting to collect on their judgments. The state court found the plaintiffs in contempt and ordered their arrest. The federal plaintiffs then filed their 42 U.S.C. § 1983 suit in federal court which implicated *Younger* abstention principles. Even though the plaintiffs' complaint could be construed as alleging bad faith by the creditors, the Supreme Court held the exception inapplicable without allegations that the state judges were enforcing the contempt procedures in bad faith. 430 U.S. at 338, 97 S.Ct. at 1218. *Juidice* seems to require *in private litigation* allegations of bad faith by state court judges before federal intervention can occur. *See* 17A *Federal Practice and Procedure* § 4255 at 255 n. 11.

■ Not unlike the Supreme Court, lower federal courts have been reluctant to apply the bad faith exception and to permit

found? Do all three constitute independent exceptions?" C. Keith Wingate, *The Bad Faith–Harassment Exception to the Younger Doctrine: Exploring the Empty Universe*, 5 Rev.Litig. 123, 132 (1986). These questions are significant because the Supreme Court has not found a bad

faith exception since *Dombrowski* and because the Supreme Court has continued to expand the reach of *Younger* abstention beyond state criminal proceedings without meaningfully exploring how these exceptions should function in these new contexts.

federal meddling in state proceedings. *See* 17A *Federal Practice and Procedure* § 4255 at 260. "In the words of one commentator, "[a]s a practical matter … the universe of bad-faith harassment claims that can be established is virtually empty.'" *Id.* (quoting Fiss, *Dombrowski*, 86 Yale L.J. 1106, 1115 (1977)). Bad faith is truly a case-by-case determination. From reading the different decisions, one can see that the courts have rejected making the exception available upon proof of one inconclusive circumstance. Evidence of bad-faith harassment must be more than multiple prosecutions, *see, e.g., Collins v. County of Kendall, Ill.*, 807 F.2d 95, 99, 101 (7th Cir.1986) (multiple prosecutions alone do not establish bad faith), *cert. denied*, 483 U.S. 1005, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987); *Schuler v. City of Chambersburg, Pa.*, 641 F.Supp. 657, 661 (M.D.Pa.1986) (multiplicity of prosecutions alone is not enough to sustain an inference of bad faith, unless the prosecutions have been unsuccessful), must be more than conclusory statements about motive, *see, e.g., Schiavone Const. Co. v. New York City Transit Auth.*, 593 F.Supp. 1257, 1259 n. 4 (S.D.N.Y.1984) (conclusory allegations of political motivation "fall short of the concrete evidence of retaliation or personal interest deemed sufficient to support a finding of bad faith," (citations omitted)), must be more than a weak claim of selective prosecution, *see, e.g. Schuler*, 641 F.Supp. at 661; *Penthouse Intern., Ltd. v. Webb*, 594 F.Supp. 1186, 1194 (N.D.Ga.1984) (all prosecutions are selective to some extent), and must be more than the prosecution of close cases, *Penthouse Intern.*, 594 F.Supp. at 1194 (such prosecutions do not indicate bad faith especially where some of the prior prosecutions have been successful). At the same time, there are facts and rules which have emerged from those cases holding in favor of bad faith exception. They too are instructive.

Three circuit court decisions best represent this latter group. *See, e.g., Lewellen v. Raff*, 843 F.2d 1103 (8th Cir.), *reh'g denied*, 851 F.2d 1108 (1988), *cert. denied*, 489 U.S. 1033, 109 S.Ct. 1171, 103 L.Ed.2d 229 (1989); *Fitzgerald v. Peek*, 636 F.2d 943 (5th Cir.), *cert. denied*, 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981); *Wilson v. Thompson*, 593 F.2d 1375 (5th Cir.1979). As far as their precedential weight, the holdings in each case have not been seriously challenged, but the facts in each have been distinguished on more than one occasion.

In *Wilson*,[3] deputy sheriffs were attempting to arrest one of the plaintiffs for civil contempt when a fight broke out. The plaintiffs were charged with battery and interfering with an officer's performance of duties. After the preliminary hearing, prosecution of the charges was not pursued, and the cases were rolled over to the court's "dead docket." One of the plaintiffs later filed a civil suit seeking damages for injuries sustained in the altercation. The prosecutors then reactivated the criminal cases by drawing up new charges against the plaintiffs. The prosecutors also informed the plaintiff's counsel in the civil suit that the criminal cases were now scheduled for trial. The plaintiffs filed in federal court their action under 42 U.S.C. § 1983 to enjoin the state from prosecuting the criminal cases. On abstention grounds, the district court denied the plaintiffs' request for a preliminary injunction. The Fifth Circuit reversed and remanded for additional proceedings. The district court had erred in holding that the bad faith exception was unavailable in single prosecution cases. Unsure of all the district court's reasons, the Fifth Circuit also said it was error to require a plaintiff to show irreparable injury apart from the bad faith prosecution. 593 F.2d at 1381.

Several important propositions are stated in *Wilson*. First, the bad faith exception "is not limited to situations of repeated or multiple prosecutions."[4] *Id.* Sec-

---

**3.** The Tenth Circuit cited this case with approval in *United States v. P.H.E., Inc.*, 965 F.2d 848, 855 (10th Cir.1992).

**4.** *Younger v. Harris* also supports such a rule, for the Court said "[t]here is no suggestion that this single prosecution against Harris is brought in bad faith *or* is only one of a series of repeated prosecutions to which he will be subjected." 401 U.S. 37, 49, 91 S.Ct. 746, 753, 27 L.Ed.2d 669 (1971) (emphasis added).

ond, " 'a showing of a bad faith [prosecution] is equivalent to a showing of irreparable injury,' " and no additional or separate irreparable injury need be shown.[5] *Id.* at 1381–82 (quoting *Shaw v. Garrison,* 467 F.2d 113, 120 (5th Cir.), *cert. denied,* 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317 (1972)). Third, in a suit to enjoin a bad faith prosecution under a valid statute as opposed to a suit to enjoin a good faith prosecution under an invalid statute, the state does not have a legitimate interest in pursuing the prosecution and the individual's federal right to immunity from bad faith prosecutions is not vindicated by defending against the state prosecution. 593 F.2d at 1382–83; *see also* Michael G. Collins, *The Right to Avoid Trial: Justifying Federal Court Intervention into Ongoing State Court Proceedings,* 66 N.C.L.Rev. 49, 62–64 (1987). The Fifth Circuit explained this last proposition in these terms:

> The reason for distinguishing, for *Younger* purposes, between a suit to enjoin a good faith prosecution and a suit to enjoin a bad faith prosecution is that the interests of both the criminal defendant and the State differ significantly from those relied on by the Court in *Younger* when the injunction is sought against a state prosecution brought in bad faith. With respect to the criminal defendant, he is seeking to protect his federal "right not to be subjected to a bad faith prosecution or a prosecution brought for purposes of harassment, [a] right [that] cannot be vindicated by undergoing the prosecution." *Shaw, supra,* 467 F.2d at 122 n. 11. The *Younger* doctrine presumes that "the only constitu-

tional issue at stake is the validity of the challenged state law—that *being prosecuted* under an arguably (or actually) invalid law is not itself a violation." *Developments in the Law—Section 1983 and Federalism,* 90 Harv.L.Rev. 1133, 1286 (1977) (emphasis in original). That presumption does not obtain when the *prosecution itself* effects the constitutional violation. (citation omitted).

. . . .

With respect to the interests of the State, it by definition does not have any legitimate interest in pursuing a bad faith prosecution brought to retaliate for or to deter the exercise of constitutionally protected rights. Perhaps the most important comity rationale of *Younger* deference—that of respect for the State's legitimate pursuit of its substantive interests, (citations omitted)—is therefore inapplicable.

593 F.2d at 1382–1383.

■ Finally, the Fifth Circuit in *Wilson* set out the burdens and order of proof involved in a preliminary injunction proceeding. The plaintiff must show: (1) that "the conduct allegedly retaliated against or sought to be deterred was constitutionally protected," and (2) that the "criminal prosecution was motivated at least in part by a purpose to retaliate for or to deter that conduct." [6] 593 F.2d at 1387. If the plaintiff meets this burden then an injunction should issue, unless the defendant can show "by a preponderance of the evidence that it would have reached the same decision as to whether to

---

**5.** Justice Brennan said as much in his concurrence in *Perez v. Ledesma,* 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971):

> [I]f in order to discourage conduct protected by the First Amendment or by some other provision of the Constitution, a State brings or threatens to bring a criminal prosecution in bad faith for the purpose of harassment, the bringing of the prosecution or the threat is itself a constitutional deprivation since it subjects a person to a burden of criminal defense which he should not have to bear, and there then exists a situation "in which defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights." *Dombrowski v. Pfister, supra,* 380 U.S. at 485, 85 S.Ct. at 1120 (other citations omitted). Accordingly, in this context a civil suit is an

appropriate means to cut short the unconstitutional state prosecution.

*Id.* 401 U.S. at 117–18, 91 S.Ct. at 693.

**6.** The Fifth Circuit later clarified that it did not intend in *Wilson* to say that a preliminary injunction should issue upon "any showing of retaliation." *Smith v. Hightower,* 693 F.2d 359, 367 (5th Cir.1982). Instead, "the *Wilson* Court contemplated that the plaintiff must prove retaliation was a major motivating factor and played a prominent role in the decision to prosecute" before a preliminary injunction is appropriate. *Id.* As for a permanent injunction, the plaintiff's burden increases to showing "that the predominant motivation for prosecuting" was retaliation. *Id.* 693 F.2d at 367 n. 19.

prosecute even had the impermissible purpose had not been considered."[7] *Id.*

■ In *Fitzgerald v. Peek,* the Fifth Circuit upheld a permanent injunction against state criminal prosecutions for embracery and terroristic threats. The panel found sufficient evidence to support the district court's finding that the prosecutions were brought to harass and retaliate against the plaintiffs for their criticism of certain public officials. 636 F.2d at 945. The salient ruling in *Fitzgerald* is that a bad faith prosecution can be proved without showing that the prosecution could not possibly result in a valid conviction. *Id.* After all, bad faith can take many forms, *Phelps v. Hamilton,* 828 F.Supp. at 843 n. 3, and there should not be just one way of proving it.

■ In *Smith v. Hightower,* the Fifth Circuit interpreted the rule from *Fitzgerald* as not meaning that a court should exclude from its consideration the strength of the evidence or the seriousness of the charges. 693 F.2d 359, 369 (5th Cir.1982). Indeed, where there is strong evidence of criminal violations or there are serious criminal charges involved, a court may have reason to infer that a prosecutor is carrying out her prosecutorial duties rather than retaliating against a plaintiff's exercise of First Amendment rights. 693 F.2d at 369–70; *see Nixon v. United States,* 703 F.Supp. 538, 570 (S.D.Miss.1988), *aff'd,* 881 F.2d 1305 (5th Cir. 1989).

The Eighth Circuit in *Lewellen* followed the Fifth Circuit's approach in affirming a preliminary injunction of state criminal proceedings. The plaintiff, a black attorney, was charged with the commission of and conspiring to commit witness bribery. The plaintiff alleged the charges were filed because of his race, because of his vigorous defense of a black client charged with rape, and because of his campaign for public office against a political ally of the sheriff. 843 F.2d at 1110. The district court had relied on evidence that the sheriff had told the plaintiff that he could avoid some of the problems facing him if he would apologize to the trial judge and the prosecutor. The sheriff also had told a local businessman that the charges were filed against the plaintiff because of his disrespectful conduct during court. There was also evidence that the prosecutors treated black attorneys disparately. Finally, the district court heard evidence that the scheduling of the plaintiff's criminal trial was released to the public just a few weeks before the general election which made it possible for the plaintiff's opponent in the senatorial race to refer to the upcoming trial during the campaign. 843 F.2d at 1110–12.

In short, this court believes the Fifth Circuit's rules and order of proof for deciding whether there is a bad faith exception to abstention are logical and workable as well as being consistent with the basic tenets of *Younger.* The defendant offers no authorities to contradict the Fifth Circuit's approach and even appears to follow it in her arguments. (Dk. 27 at 17). Informed of the different precedent and guided by an established order of proof, the court is ready to consider the facts.

### A. Constitutionally Protected Activity

■ The plaintiffs allege that the criminal prosecutions pending are brought to deter and retaliate against them for their constitutionally protected speech. The defendant admits that the First Amendment requires her to respect the plaintiffs' right to disseminate in a lawful manner their theological message that "God hates Fags." (Dk. 27 at 18). She also implicitly admits that the plaintiffs' message can be communicated by picketing, speaking or faxing, so long as it is done lawfully. Since the Constitution protects speech, pleasant or unpleasant, appealing or disquieting and tolerant or intolerant, the defendant has little choice but to concede[8] that the plaintiffs' speech is constitutionally protected.

---

7. Relevant here is whether the prosecution was brought with any hope of a valid conviction and what significance the alleged criminal activity may have. *Wilson,* 593 F.2d at 1387.

8. The defendant's denial of any retaliatory motive does not bear upon whether the plaintiffs' speech is constitutionally protected. The defendant confuses this element with the next. (Dk. 27 at 17–18).

## B. *Motivation Behind Criminal Prosecution*

To obtain a preliminary injunction, the plaintiff must show that "retaliation was a major motivating factor and played a prominent role" in the defendant's decision to prosecute the criminal cases. *Smith v. Hightower,* 693 F.2d 359, 367 n. 19 (5th Cir.1982). But in the summary judgment context, the defendant must show first the absence of genuine issues of material fact given the relevant law on the bad faith exception. If the defendant clears this hurdle, the plaintiffs then need only show that genuine issues do exist for trial.

The defendant's motion has four basic contentions; all of which are relevant to the plaintiffs' burden of proving motivation, but none of which can sustain summary judgment for the defendant. First, the defendant argues that Fred Phelps, Sr. has a history of targeting and attacking public officials and that the defendant is simply one more name on the list of Phelps' "victims." The defendant sees any evidence of the plaintiffs' attacks on her as only the plaintiffs' attempt to manufacture a bad faith theory and to acquire absolute immunity from criminal prosecution. Second, each of the pending criminal cases is based on probable cause and supported by a sworn affidavit. Third, the defendant's decisions to prosecute each of the plaintiffs were made in the exercise of broad discretion, and courts are poorly situated to second-guess those decisions. Fourth, the state courts, in particular Judge Michael Barbara and Judge Marla Lukert, are eminently qualified to decide the plaintiffs' claims of bad faith prosecution.

Though it did serve the defendant in providing a reason to attack Fred Phelps on his faxes and on his past, the defendant's first argument is otherwise insignificant. This court never suggested in its prior order that Fred Phelps' vitriolic criticism of the defendant was enough for a reasonable jury to conclude that the pending criminal prosecutions were being pursued in bad faith. Nor does the case law cited in that order or, for that matter, cited in this order support such a sweeping proposition. The plaintiffs also do not advance a similar contention.

Moreover, the defendant, through the attached faxes, shows that the plaintiffs do not reserve their criticism for district attorneys.

That Fred Phelps, Sr. has criticized the defendant's performance in public office may be a reason for the defendant to retaliate against Fred Phelps, Sr. and his followers, but it is not the only one advanced by the plaintiffs and it is not the only evidence in support of their bad faith prosecution claim. The defendant and her family have had their characters personally attacked, parodied, and condemned by Fred Phelps, Sr. The defendant and her family have actively opposed the plaintiffs' anti-homosexual message. They have participated in counter-protests, made public statements, and helped in sponsoring events directed against the plaintiffs' activities. During her successful campaign for district attorney, the defendant promised and distributed literature evidencing the same promise to fight against crime, hatred, prejudice and Fred Phelps. Segments of the religious community and the community-at-large have publicly expressed their opposition to and dislike of the Phelps. Community groups have asked local officials to pass ordinances which would limit the locations and times of the plaintiffs' picketing. In sustaining the Phelps' motion for change of venue in the pending state criminal cases, Judge Barbara observed this about the community attitude towards the Phelps:

> The [media] coverage has been most extensive. Far outweighing the matter of what these charges are all about. And it seems like everyone got caught up and is getting caught up in this thing, insofar as letters to the editors, TV programs, editorials. Now, whether they reflect the feeling of the community, it's difficult to say, but certainly they reflect feeling among a good portion of the community having very, very strong feelings against defendant Phelps and the defendant Phelps' family.

(Dk. 43 at 9). By prosecuting the plaintiffs, the defendant is able to capture the voting public's attention as well as encourage their perception of not only meeting campaign promises but of being a public official who responds to the community's demands. One

or all of these circumstances are potential reasons that the defendant may have to prosecute the plaintiffs in retaliation for their anti-homosexual picketing and speech directed towards her and others.

■ To prove that conduct is taken in bad faith generally requires more than just a possible reason for the bad faith motive to exist. The defendant's first argument seems to assume that this is all the proof that the plaintiffs have in support of their case. The plaintiffs, however, have come forth with other evidence—mostly circumstantial evidence that the defendant is acting consistent with a retaliatory motive. First, there are multiple criminal cases pending against the picketers for their conduct during or immediately following a picket. The defendant filed several of these cases within one month of taking office. The relationship, working and personal, between the plaintiffs and the defendant is nothing short of antagonistic and hostile. Both sides have reason to improve on that relationship and either defuse or at least contain what appears to be a volatile situation.

Despite all, but two, of the criminal charges being misdemeanors against the plaintiffs, the defendant has devoted what appears to be inordinate time and resources of the district attorney's office in prosecuting these charges. The plaintiffs offer evidence from which one could infer selective prosecution. Whenever violence has erupted on the picketing lines, the defendant either has filed charges against one or more of the plaintiffs or has charged no one saying the evidence was insufficient or inconclusive. In the state court proceedings, the Phelps testified to many occasions while picketing when they were struck by objects thrown from passing vehicles or intentionally pushed or hit by someone who approached them. The plaintiffs also testified to several instances when they were assaulted either by vehicles being driven up on the grass towards them or by guns being pointed at them from passing vehicles. They filed reports of these incidents, but no criminal charges have ever been filed. The refusal to prosecute criminal actions committed against a certain segment of the community can send a message; the

wrongfulness of which should be apparent to all. The plaintiffs' allegations and evidence of bad faith are not limited to whether the defendant may have cause for retaliating, for they also intend to offer evidence that the defendant has acted consistent with the alleged retaliatory motive. Moreover, the same evidence also rebuts any attempt by the defendant to show that she would have prosecuted these cases even if the impermissible purpose had not been considered.

■ The defendant's next argument is that each of the pending criminal cases against the plaintiffs is supported by a sworn affidavit that shows probable cause. The bad faith exception does not depend on the plaintiffs proving that the prosecutions could not possibly result in valid convictions. *Fitzgerald v. Peek*, 636 F.2d at 945. The irreparable injury is that the prosecution is brought in bad faith; no additional injury need be shown. *Lewellen v. Raff*, 843 F.2d at 1112; *Ruscavage v. Zuratt*, 821 F.Supp. 1078, 1082 (E.D.Pa.1993), *amended on other grounds*, 831 F.Supp. 417 (E.D.Pa.1993). On the other hand, the strength of the defendant's criminal case as shown by the sworn affidavit and other evidence is a factor relevant in deciding whether the prosecutions would have occurred absent the retaliatory motive. *Lewellen*, 851 F.2d at 1109–10. The plaintiffs offer evidence disputing much of the sworn affidavits. As a result, the reasonableness of the defendant's expectation in obtaining valid convictions against the plaintiffs is a genuine issue of material fact.

The defendant's third argument is that her decisions to prosecute the plaintiffs were made well within the bounds of her prosecutorial discretion. She relies in large part on the following passage from *Wayte v. United States*, 470 U.S. 598, 607–08, 105 S.Ct. 1524, 1530–31, 84 L.Ed.2d 547 (1985):

> In our criminal justice system, the Government retains "broad discretion" as to whom to prosecute. (Citations omitted). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."

*Bordenkircher v. Hayes,* 434 U.S. 357, 364 [, 98 S.Ct. 663, 668, 54 L.Ed.2d 604] (1978). This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy. All these are substantial concerns that make the courts properly hesitant to examine the decision whether to prosecute.

The defendant insists she has exercised her discretion in an even-handed fashion and has based her decisions on the evidence available and the peace and safety of the community.

 In *Wayte,* the Supreme Court also observed that prosecutorial discretion is broad but not " 'unfettered' " and is " 'subject to constitutional restraints.' " 470 U.S. at 608, 105 S.Ct. at 1531 (quoting *United States v. Batchelder,* 442 U.S. 114, 125, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1979)). A decision to prosecute may not be based on the defendant's exercise of constitutional rights. *Wayte,* 470 U.S. at 608, 105 S.Ct. at 1531; *see United States v. P.H.E., Inc.,* 965 F.2d at 849 ("The First Amendment bars a criminal prosecution where the proceeding is motivated by the improper purpose of interfering with the defendant's constitutionally protected speech.") A court may intervene in prosecutorial decisions when necessary to enjoin bad faith prosecutions. *Smith v. Meese,* 821 F.2d 1484, 1490 (11th Cir.1987). In short, a prosecutor does not have the lawful discretion to retaliate against someone for exercising their First Amendment rights. The defendant

calls it an exercise of prosecutorial discretion, the plaintiffs call it retaliation, and the court calls it a genuine issue of material fact.

 Finally, the defendant argues the state courts are eminently qualified to handle the plaintiffs' constitutional claims. This argument is wide of the mark. The adequacy of the state forum is the assumption on which *Younger* abstention is premised.[9] "The operation of the *Younger* doctrine is dependent upon the ability of the state courts to provide an adequate remedy for the violation of federal rights." *DeSpain v. Johnston,* 731 F.2d 1171, 1178 (5th Cir.1984). If there is no adequate state forum, then there is no foundation for *Younger* abstention and there also is no need to consider the exceptions to *Younger* abstention. For that matter, the Supreme Court has already decided that the limited exceptions are circumstances where as a matter of federal policy the state forum cannot provide a constitutionally adequate remedy. *See, e.g., Younger,* 401 U.S. at 56, 91 S.Ct. at 755 (Stewart and Harlan, JJ., concurring) (A bad faith prosecution should be enjoined, because "the reasons of policy for deferring to state adjudication are outweighed by the injury flowing from the very bringing of the state proceedings, by the perversion of the very process that is supposed to provide vindication, and by the need for speedy and effective action to protect federal rights.") The Court in *Younger* said nothing about the exceptions being available only upon the plaintiff proving that the claims could not be presented and decided in a competent state forum. The bringing of a bad faith prosecution is a constitutional deprivation in itself, and defense of the state criminal prosecution " 'will not assure adequate vindication of constitutional rights.' " *Perez v. Ledesma,* 401 U.S. at 118, 91 S.Ct. at 693 (Brennan, J., concurring) (quoting *Dombrowski,* 380 U.S. at 485, 85 S.Ct. at 1120); *see also Arkebauer v. Kiley,* 985 F.2d at 1358 (" '[A] showing of bad faith (prosecution) is equivalent to a showing of irreparable injury for purposes of the comity restraints defined in *Younger.*' " (quoting *Wilson v. Thompson,* 593 F.2d at 1382)). In simplest terms, a bad faith prosecution causes an im-

---

9. See footnote one *supra.*

mediate and irretrievable constitutional injury.

In her arguments and analysis of the bad faith issue, the defendant made no attempt to distinguish between the different plaintiffs. Nor can the court find from the record a factual basis for doing so. Throughout the testimony and documents, the plaintiffs are commonly referred to as a group by reason of their membership in the Westboro Baptist Church, their participation in the picketing activities, or their familial relationship to Fred Phelps, Sr. Most of the evidence relevant to the bad faith prosecution claims applies with equal force to each of the plaintiffs and their separate criminal cases. For now, the court will treat the plaintiffs as a group in handling the abstention question and the bad faith prosecution claims.

▮ With the exception of its statement of uncontroverted facts, none of the court's discussion should be construed as findings of fact. Rule 56 requires a court to accept a plaintiff's facts as true if directly supported by or reasonably inferred from proper, admissible Rule 56 evidence. Weighing the evidence or assessing witness credibility are matters beyond the court's purview in Rule 56 proceedings. To reiterate, the court does not find that the defendant has acted in bad faith in bringing or prosecuting all or any of the pending criminal cases against the plaintiffs.

In contrast, the court does hold that the defendant is not entitled to summary judgment on *Younger* abstention grounds. The evidence of record reveals several genuine issues of material fact in deciding whether the bad faith exception applies here. An evidentiary hearing on the plaintiffs' motion for preliminary injunction, or possibly a consolidation of the hearing with a trial on the merits along with an agreed stay of the criminal prosecutions, is the next step in resolving the bad faith issue. Because the plaintiffs claim the prosecutions are brought to retaliate against their exercise of constitutional rights, the issue of the bad faith exception to *Younger* merges with the bad faith prosecution claim, as proof of one necessarily constitutes proof of the other. *See Wilson,* 593 F.2d at 1385 n. 17; *Ruscavage,* 821

F.Supp. at 1082. The court will have a telephone conference with counsel within one week of this order so that the preliminary injunction hearing can be scheduled and conducted as soon as the court's calendar permits.

Since the court denied the summary judgment motion, the time and words spent on this issue may seem a waste. The court, instead, believes the order, besides representing its struggle to shed some light on this obscure exception, provides a framework for the parties to present their arguments and evidence in later proceedings. Further, it shows the court's concern over the gravity of this issue and over what the plaintiffs have alleged, averred, and testified. The plaintiffs' evidence of bad faith prosecutions is more than a single inconclusive circumstance or even a set of circumstances that can be dismissed merely as inconsequential or implausible. The court decided against recounting that evidence in detail, not out of any judgment about the truthfulness or relevance of the same, but because of the extra time and space that would be required to set it out.

**II. Do the plaintiffs have standing to challenge the facial constitutionality of the Kansas Anti–Stalking Statute, 1993 Kan.Sess.Laws Ch. 291, § 253; the Kansas Telephone Harassment Statute, K.S.A. 21–4113, as amended to include telefacsimile communications, 1992 Kan.Sess.Laws Ch. 298, § 79; and the Kansas Funeral Picketing Act, K.S.A.1992 Supp. 21–4015?**

▮ It is a jurisdictional prerequisite that the plaintiffs have standing to sue for the requested relief. *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 364 (1992). At an "irreducible minimum," standing consists of three elements: (1) "an 'injury in fact'—an invasion of a legally-protected interest which is ... concrete," "particularized," "actual or imminent," and not "conjectural or hypothetical;" (2) "a causal connection between the injury and conduct complained of;" and (3) the injury be of a nature that it is likely to be redressed by a favorable decision. *Id.* at ——, 112 S.Ct. at 2136. The burden rests with the plaintiffs to prove these elements

"in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation." *Id.* at ——, 112 S.Ct. at 2136. In opposing the defendant's motion for summary judgment, the plaintiffs must come forth with specific facts offered in affidavits, instead of mere allegations, to prevail against the motion. *Id.* at ——, 112 S.Ct. at 2137.

In a pre-enforcement setting, the plaintiff must show " 'a genuine threat of enforcement' of the . . . [statute] against his future activities." *Houston v. Hill,* 482 U.S. 451, 459 n. 7, 107 S.Ct. 2502, 2508 n. 7, 96 L.Ed.2d 398 (1987) (quoting *Steffel v. Thompson,* 415 U.S. 452, 475, 94 S.Ct. 1209, 1223, 39 L.Ed.2d 505 (1974)). "Under *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 299, 99 S.Ct. 2301, 2309, 60 L.Ed.2d 895 (1979), a plaintiff must allege that either (1) he was threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution." *American Civil Liberties Union v. The Florida Bar,* 999 F.2d 1486, 1492 (11th Cir.1993). The threat of future injury must be "real and immediate," *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983), and not just "conjectural" or "hypothetical," *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974), or "speculative," *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–26, 33 L.Ed.2d 154 (1972). "[T]he mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy." *Stoianoff v. State of Montana,* 695 F.2d 1214, 1223 (9th Cir.1983). "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum,* 408 U.S. at 13–14, 92 S.Ct. at 2325–26 (The plaintiffs lacked standing to challenge the Army's surveillance of political activists, because they failed to allege any specific action or investigation towards them). Courts typically evaluate the threat of injury by asking " 'whether the plaintiff is seriously interested in disobeying, and [whether] the defendant [is] seriously intent on enforcing the challenged measure.' " *American Civil Liberties Union,*

999 F.2d at 1492 (quoting *International Soc'y for Krishna Consciousness v. Eaves,* 601 F.2d 809, 818 (5th Cir.1979)).

Standing requirements are often lowered when the statutes face First Amendment challenges. *West Virginia Pride, Inc. v. Wood County, W. Va.,* 811 F.Supp. 1142, 1145 (S.D.W.Va.1993). The threat of enforcement need not take the form of a specific, express threat of prosecution to the plaintiffs, but it must be more than some broad policy to enforce the laws generally. *Entertainment Concepts, Inc., III v. Maciejewski,* 631 F.2d 497, 500 (7th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981). When a law is passed in reaction to or can be said to target a plaintiff's continuing First Amendment activities and the plaintiff is the only or a principal party affected by the law, then the plaintiff faces a real and imminent threat of prosecution for violating that law. *See Sequoia Books, Inc. v. Ingemunson,* 901 F.2d 630, 633 (7th Cir.), *cert. denied,* 498 U.S. 959, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990); *Entertainment Concepts, Inc., III v. Maciejewski,* 631 F.2d at 500; *cf. Virginia v. American Booksellers Assn., Inc.,* 484 U.S. 383, 392–93, 108 S.Ct. 636, 642–43, 98 L.Ed.2d 782 (1988) (Booksellers had standing to challenge state statute prohibiting display of sexual materials, because the statute was aimed directly at plaintiffs, they were required to comply with it or risk prosecution, the State did not suggest that the statute would not be enforced, and a danger of the statute was self-censorship which could occur even without an actual prosecution). In such circumstances, standing is "self-evident," and the plaintiff need not "first expose" himself to arrest or prosecution before bringing his constitutional challenge. *Sequoia Books,* 901 F.2d at 634; *see, e.g., Frisby v. Schultz,* 487 U.S. 474, 476–77, 108 S.Ct. 2495, 2498, 101 L.Ed.2d 420 (1988) (Anti-abortionist picketers "faced" the "threat of arrest and prosecution" when the town board passed an ordinance banning residential picketing in response to anti-abortionist picketing outside a doctor's residence). That the plaintiff need not expose himself to a criminal prosecution to gain standing is "especially true in a First Amendment case

because of 'the sensitive nature of constitutionally protected expression.'" *San Francisco County Democratic Cent. Comm. v. Eu*, 826 F.2d 814, 821 (9th Cir.1987) (quoting *Dombrowski*, 380 U.S. at 486, 85 S.Ct. at 1120), *aff'd*, 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989).

The plaintiffs challenge these three Kansas statutes both as unconstitutional on their face and unconstitutional as applied to them. It is neither the usual nor the desirable judicial practice to address a facial overbreadth challenge before deciding if the statute is constitutional as applied. *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 484–85, 109 S.Ct. 3028, 3037, 106 L.Ed.2d 388 (1989). Because the three statutes have never been applied against the plaintiffs, they are without standing to challenge the statutes as applied. *Davis v. Scherer*, 468 U.S. 183, 189 n. 7, 104 S.Ct. 3012, 3016 n. 7, 82 L.Ed.2d 139 (1984); *New York Civil Service Comm'n v. Snead*, 425 U.S. 457, 458, 96 S.Ct. 1630, 1631, 48 L.Ed.2d 88 (1976). This leaves plaintiffs' facial challenges as the only other possible basis for standing.

"Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 958, 104 S.Ct. 2839, 2847, 81 L.Ed.2d 786 (1984). Such facial challenges [10] on the grounds of overbreadth and vagueness can be made in a pre-enforcement setting. *See, e.g., Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). When the enactment does not reach a substantial amount of constitutionally protected conduct,

the overbreadth challenge must fail.[11] *Id.* at 494, 102 S.Ct. at 1191. This is a standing issue only to this extent: if the plaintiff fails on the merits of the overbreadth claim, then the plaintiff is without standing to allege the statute is unconstitutional in how it might be applied to others. *Munson*, 467 U.S. at 959, 104 S.Ct. at 2848. In the absence of overbreadth, the court alternatively "should examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications." *Village of Hoffman Estates*, 455 U.S. at 494–95, 102 S.Ct. at 1191.

In sum, the standing issue here is two-pronged. Do the plaintiffs face a genuine threat of prosecution under each of the three challenged statutes? Do the plaintiffs have a colorable constitutional claim of overbreadth or vagueness as to each of the three challenged statutes?

The Kansas Funeral Picketing Act is aimed directly at the plaintiffs and other members of the Westboro Baptist Church who picket funerals. It is uncontroverted that the Kansas Legislature passed this Act in response to the plaintiffs' picketing at funerals. The plaintiffs aver that funerals are one of the places where they continue to picket. To date, there have not been any arrests at the funeral pickets or criminal charges filed. According to the plaintiffs, the lack of arrests is due to their good faith attempts at complying with the Act rather than any disinclination by prosecutors to enforce it. The plaintiffs point to two instances, one in Shawnee County and the other in Sedgwick County, when they asked the district attorneys' offices for interpretations as to what constituted "before" or "after" a

**10.** "A 'facial' challenge, in this context, means a claim that the law is 'invalid in toto—and therefore incapable of any valid application.' *Steffel v. Thompson*, 415 U.S. 452, 474, 94 S.Ct. 1209, 1223, 39 L.Ed.2d 505 (1974). In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered. *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972)." *Village of Hoffman Estates v. Flipside,*

*Hoffman Estates, Inc.*, 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 1191 n. 5, 71 L.Ed.2d 362 (1982).

**11.** In a similar vein, a statute can be "so vague that it can reasonably be interpreted to prohibit constitutionally protected speech as well as conduct the state may constitutionally forbid," thus chilling freedom of speech. *United States v. Gaudreau*, 860 F.2d 357, 360 (10th Cir.1988).

funeral. On both occasions, the district attorney denied the plaintiffs' request for guidance and the plaintiffs' First Amendment rights arguably were chilled from the resulting threat of arbitrary enforcement. The plaintiffs stopped picketing one and one-half hours before the funeral in Shawnee County, and they abandoned their plans to picket in Sedgwick County. The defendant does not disavow any intent to enforce this Act. In fact, when the plaintiffs wrote the defendant saying that in light of her refusal to give an opinion they would assume the Act only prohibited picketing which occurs less than thirty minutes before or after a funeral, the defendant wrote back: "You can NOT assume this. That is *not* the law and we aren't in the position to make the law." Based on the evidence of record, the plaintiffs have shown they face a genuine threat of arrest and prosecution under the Kansas Funeral Picketing Act.

 The court does not reach the same conclusion as to the Kansas Telephone Harassment Statute and the Kansas Anti-Stalking Statute. The plaintiffs have not come forth with proper Rule 56 evidence demonstrating that these statutes were amended or passed in response to the plaintiffs' activities; that these statutes target the plaintiffs; that the plaintiffs engage in conduct arguably covered by the Anti–Stalking statute; that their First Amendment rights have been chilled by threats of prosecution under these statutes; and that the defendant intends or plans to prosecute the plaintiffs under these statutes for conduct arguably protected under the Constitution. Having failed to show that they face a genuine threat of prosecution under these two statutes, the plaintiffs are without standing to challenge the constitutionality of either provision.

### III. Whether the Kansas Funeral Picketing Act, K.S.A. 21–4015, is facially unconstitutional?

The plaintiffs marshal several fronts to their constitutional attack on this statute. They contend the statute restricts their "religious practice of picketing funerals of homosexuals who die and whose homosexual lifestyle is touted or glorified publicly." (Dk. 29 at 5). Against this constitutional challenge,

only the *amicus* brief filed by the City of Kansas City, Missouri, responds, and its arguments are conclusory and cursory.

 The court believes oral argument and an evidentiary hearing would assist it in deciding first whether the anti-homosexual funeral picketing is an integral part of the plaintiff's religion and whether the plaintiffs are sincere in their professions that the funeral picketing is conducted for religious reasons. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* —— U.S. ——, ——, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472, 489 (1993). Even though a law has the incidental effect of burdening a religious practice, it does not violate the Free Exercise Clause if it is found to be neutral and of general applicability, but if it fails these two tests then the law "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.* The plaintiffs argue the statute is neither neutral nor of general applicability. The neutrality test requires more than facial neutrality, for "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Id.* at ——, 113 S.Ct. at 227, 124 L.Ed.2d at 491. As for general applicability, "government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Id.* at ——, 113 S.Ct. at 2232, 124 L.Ed.2d at 496. A statute lacks general applicability, though its terms are neutral, when its "design, construction, or enforcement target[s] the practices of a particular religion for discriminatory treatment." *Id.* at ——, 113 S.Ct. at 2239, 124 L.Ed.2d at 506 (Scalia, J. and Rehnquist, C.J., concurring). The court believes that a hearing at which arguments and maybe even evidence is offered would assist the court in understanding the arguments of both sides on this free exercise claim.

The plaintiffs also challenge the statute as in violation of their First Amendment right to free speech. They first argue that the statute is vague in not informing and establishing guidelines with sufficient definiteness as to when and where picketing is prohibited. They also contend the statute is not content-neutral nor narrowly tailored to serve any legitimate state interest. Though the court

believes the plaintiffs have raised a serious issue in the statute's failure to specify what constitutes "before" or "after" a funeral, the court will reserve its ruling on this claim until argument and evidence is heard on all of the plaintiffs' First Amendment challenges to this statute.

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment (Dk. 16) is granted as to the plaintiffs' standing to bring the "as applied" constitutional challenges to the Kansas Funeral Picketing Act, the Kansas Telephone Harassment Statute as amended, and the Kansas Anti–Stalking Statute and as to the plaintiff's standing to bring the facial constitutional challenges to the Kansas Telephone Harassment Statute as amended and the Kansas Anti–Stalking Statute; and is denied as to the issue of abstention on the plaintiffs' bad faith prosecution claims and as to the plaintiffs' standing to challenge the facial constitutionality of the Kansas Funeral Picketing Act.

IT IS FURTHER ORDERED that the plaintiffs' motion for summary judgment (Dk. 19) is denied, but the court will consider for purposes of this case the parties' and *amicus* briefs already submitted on the issue of the constitutionality of the Kansas Funeral Picketing Act in future hearings and proceedings on this issue.